Kevin P.B. Johnson (Bar No. 177129)
   kevinjohnson@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th floor
Redwood Shores, CA 94065
Tel.: 650-801-5000
Fax.: 650-801-5100

Edward J. DeFranco (Bar No. 165596)
   eddefranco@quinnemenauel.com
Raymond N. Nimrod (*pro hac vice*)
   raynimrod@quinnemanuel.com
Eric Huang (*pro hac vice*)
   erichuang@quinnemanuel.com
Krista M. Rycroft (*pro hac vice*)
   kristarycroft@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd floor
New York, NY 10010
Tel.: 212-849-7000
Fax.: 212-849-7100

Attorneys for Defendant
MARVELL SEMICONDUCTOR, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FRANCE TELECOM S.A., <br><br> Plaintiff, <br><br> vs. <br><br> MARVELL SEMICONDUCTOR, INC., <br><br> Defendant. | Case No. 12-CV-04967 (WHO) <br><br> Date:   September 17, 2014 <br> Time:  2:00 p.m. <br> Place:  450 Golden Gate Avenue <br>          San Francisco, CA 94102 <br>          Courtroom 2, 17th Floor <br><br> **EXPEDITED BRIEFING REQUESTED** |

**MARVELL SEMICONDUCTOR, INC.'S *DAUBERT* MOTION TO
EXCLUDE OPINIONS AND TESTIMONY OF PROF. BRADFORD CORNELL**

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................................................ 1

II.  LEGAL STANDARD .......................................................................................................... 3

III. ARGUMENT ........................................................................................................................ 4

    A.   Professor Cornell Used Erroneous Legal Standards In His Hypothetical Negotiation Analysis To Arrive At His Reasonable Royalty Opinions. .................. 4

    B.   Professor Cornell's Reasonable Royalty Opinions Are Unreliable Because The Rely On Impermissible Speculation Regarding Use In The United States. ................................................................................................................... 8

    C.   Professor Cornell Impermissibly Speculates on Actual Use By Using Third-Party Sales Numbers As A Proxy for Actual Use. .................................................. 12

IV.  CONCLUSION .................................................................................................................. 13

Case3:12-cv-04967-WHO   Document187   Filed08/12/14   Page3 of 18
REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

# TABLE OF AUTHORITIES

**Page**

### Cases

*Estate of Barabin v. AstenJohnson, Inc.*,
    740 F.3d 457 (9th Cir. 2014) ..................................................................................................3

*Brown v. Duchesne*,
    60 U.S. 183 (1856) .................................................................................................................8

*Cooper v. Brown*,
    510 F.3d 870 (9th Cir. 2007) ..................................................................................................3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) .......................................................................................................1, 3, 4

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp.116 (S.D.N.Y. 1970) .......................................................................................2, 6

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ...............................................................................................................3

*Limelight Networks, Inc. v. Akamai Techs. Inc.*,
    134 S. Ct. 2111 (2014) ...........................................................................................................4

*Lucent Techs. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ....................................................................................4, 9, 13

*Microsoft Corp. v. AT & T Corp.*,
    550 U.S. 437 (2007) ...............................................................................................................8

*Oracle Am., Inc. v. Google Inc.*,
    798 F. Supp. 2d 1111 (N.D. Cal. 2011) ..............................................................................4, 8

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013) .........................................................................3, 4, 8, 9, 11, 13

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ...........................................................................................4, 12

*U.S. v. Rincon*,
    28 F.3d 921 (9th Cir. 1994) ....................................................................................................4

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ...........................................................................................4, 9

*Wordtech Sys., Inc v. Integrated Networks Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2009) ..............................................................................................4

-ii-                                         Case No. 12-CV-04967
MARVELL SEMICONDUCTOR INC.'S *DAUBERT* MOTION

**Statutes**

| | |
|---|---|
| 35 U.S.C. § 154(a)(2) | 1 |
| 35 U.S.C. § 154(c)(1) | 1 |
| 35 U.S.C. § 271(a) | 4 |
| Fed. R. Evid. 402 | 3 |
| Fed. R. Evid. 403 | 3 |
| Fed. R. Evid. 702 | 3 |

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that at 3:00 p.m. on September 17, 2014[1], defendant Marvell Semiconductor, Inc. ("MSI") will and hereby does move this Court for an Order granting its motion to exclude the opinions and testimony of France Telecom S.A.'s ("France Telecom") witness Professor Bradford Cornell.  This motion is based on this notice of motion and supporting memorandum of points and authorities; the supporting Declaration of Krista M. Rycroft ("Rycroft Decl."); and, MSI's unopposed administrative motion to seek an expedited briefing and hearing schedule, all filed herewith, and such other written and oral argument as may be presented at or before the time this motion is deemed submitted by the Court.

# RELIEF SOUGHT

MSI respectfully requests that its motion be granted, and that the Court preclude Professor Cornell from presenting certain opinions regarding reasonable royalty damages at trial.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

France Telecom asserts method claims 1 and 10 of the '747 patent against MSI, accusing certain communications processor chips that provide functionality for handheld devices such as smartphones to access cellular communications networks owned and operated by third parties. (D.I. 1.)  In particular, France Telecom alleges that the accused chips infringed based on a process called "turbo coding" allegedly performed when devices incorporating the accused chips were used to access 3G or 4G data networks in the United States.  The '747 patent expired on August 29, 2012.  *See* 35 U.S.C. § 154(a)(2), (c)(1).

---

[1] Pursuant to the accompanying administrative motion, MSI respectfully requests that the Court set the following schedule:  (1) France Telecom's opposition is due August 19, 2014; (2) MSI has no reply brief; and (3) the *Daubert* motion shall be argued at the August 26, 2014 Final Pre-trial Conference set for 3:00 p.m.  France Telecom has agreed to this proposed schedule. (Rycroft Decl. Ex. 1, August 10, 2014 email from J. LoBue to E. Huang).

1   France Telecom seeks a reasonable royalty for MSI's alleged past infringement, not lost
2   profits.  France Telecom relies on the opinion of Professor Cornell who purports to have applied
3   the hypothetical negotiations analysis under *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318
4   F. Supp. 116 (S.D.N.Y. 1970).  Using the hypothetical negotiation Professor Cornell opines that
5   "France Telecom has sustained ▇▇▇▇▇ in damages" for MSI's alleged infringement of the
6   '747 patent claims based on a one-time lump sum royalty payment.  (Rycroft Decl. Ex. 2, Cornell
7   Rpt. at ¶ 17).  He also sets forth four different, alternative damages scenarios "[t]o the extent that
8   the jury were to determine that France Telecom and Marvell [*i.e.* MSI] would have agreed to a
9   running royalty rate in the hypothetical negotiation, as opposed to a one-time lump sum royalty
10  payment." (Rycroft Decl. Ex. 2, Cornell Rpt. at ¶ 21).  Those alternative scenarios result in
11  royalty payments ranging from ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇:

- "Marvell 3G Chips": ▇▇▇▇▇
- "Marvell 3G Chips Sold to RIM": ▇▇▇▇▇
- "Marvell 3G Chips Shipped to the US": ▇▇▇▇▇
- "Marvell 3G Chips Sold to RIM, Which RIM Than Sold Into The US As Part Of Assembled Handsets": ▇▇▇▇▇

17  (Rycroft Decl. Ex. 2, Cornell Rpt. at ¶ 22).
18      Professor Cornell's entire reasonable royalty analysis is based on unreliable methodology
19  and is grounded in irrelevant and/or unreliable data.  First, Professor Cornell applied the incorrect
20  law regarding the hypothetical negotiation which led him to:  (1) rely on irrelevant worldwide
21  sales projections of both MSI and non-party Marvell Asia Pte. Ltd. ("MAPL") and (2) erroneously
22  include MAPL sales in at least 3 of his 4 alternative scenarios.  Second, Professor Cornell also
23  speculated, without any evidentiary basis, that 100% of the accused chips sold by both MSI and
24  MAPL somehow were imported and used in an infringing manner in the United States.  Third,
25  Professor Cornell relied on sales data produced by third-party Blackberry Corporation
26  ("Blackberry," formerly known as RIM) as proof of actual use in the United States, even though
27  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and does not identify which chips were obtained from MSI
28  rather than non-party MAPL.

Because Professor Cornell's reasoning and methodology in determining alleged damages in this case are unreliable and plainly contrary to the law (and the law of the case) his proffered testimony based on such unreliable reasoning and methodology should be excluded. Fed. R. Evid. 702. The probative value of his opinions is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time. Fed. R. Evid. 402, 403.

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. Under *Daubert*, the district court serves as the gatekeeper to ensure that proposed expert testimony meets the requirements of Rule 702. *Daubert*, 509 U.S. at 589-90. Specifically, expert testimony is not admissible unless: 1) the witness is properly qualified to give testimony; 2) the reasoning or methodology underlying the testimony is scientifically reliable, and 3) the testimony is relevant. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591-593. "[T]he proponent [of the proposed expert] has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702, 2000 Advisory Committee's Note. "If evidence lacks either reliability or relevance, it must be excluded." *Cooper v. Brown*, 510 F.3d 870, 943 (9th Cir. 2007); *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014). To satisfy the reliability prong, an expert's testimony must be based on sufficient facts or data and must be the product of reliable principles and methods that are properly applied. *See* Fed. R. Evid. 702. "Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Cooper*, 510 F.3d at 942 (citation omitted); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1372-76 (Fed. Cir. 2013) (excluding evidence based on speculation). When an expert's testimony does not satisfy the requirements of Rule 702, a court possesses considerable discretion to exclude it. *See*, *e.g.*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999). Expert testimony that is "otherwise admissible may be excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *U.S. v. Rincon*, 28 F.3d 921, 923 (9th Cir. 1994) (citing *Daubert*, 509 U.S. at 595).

## III. ARGUMENT

France Telecom bears the burden of proving damages. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011); *Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). "In determining damages, a jury may rely on expert testimony." *Power Integrations*, 711 F.3d at 1373. "District courts, as gatekeepers, must nevertheless ensure that all expert testimony is rooted in firm scientific or technical background," including opinions relating to potential damages for patent infringement. *Id*. (citing *Daubert*, 509 U.S. 589-90).

Here, France Telecom alleges that MSI infringed two method claims of the '747 patent and, thus, must prove that, for each method claim, each of the claimed steps was performed by a single actor in the United States. *Limelight Networks, Inc. v. Akamai Techs. Inc.*, 134 S.Ct. 2111, 2117 (2014); 35 U.S.C. § 271(a). Only with proof of infringement may France Telecom request damages and, even then, the amount of damages "ought to be correlated, in some respect, to the extent the infringing method is used" in the United States. *Lucent Techs.*, 580 F.3d at 1324. Here, France Telecom's experts base their opinions on the incorrect legal standard—not the proper standard used to assess the outcome of a hypothetical negotiation—and on wholly unreliable evidence and rank speculation regarding the required use of the claimed inventions in the United States.

### A. Professor Cornell Used Erroneous Legal Standards In His Hypothetical Negotiation Analysis To Arrive At His Reasonable Royalty Opinions.

Professor Cornell's entire damages opinion is unreliable because it is grounded in a legally erroneous hypothetical negotiation analysis of patent damages. Under Federal Circuit law, the hypothetical negotiation takes place between the patentee and the alleged ***infringer***—here, defendant MSI. *See, e.g.*, *Wordtech Sys., Inc v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2009) ("A reasonable royalty can be calculated from . . . a hypothetical negotiation between the patentee and infringer."); *Oracle*, 798 F. Supp. 2d at 117 (the hypothetical negotiation takes place 'between the patentee and infringer ... at the time infringement began.'"). "At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d

860, 869 (Fed. Cir. 2010)(emphasis added) ("[A] reasonable royalty requires a court to hypothesize, not to speculate."). *Id.*

At his March 18, 2014 deposition, Professor Cornell repeatedly admitted that he did not evaluate the hypothetical negotiation with defendant MSI as the alleged infringer. Rather, he impermissibly included at least two other separate legal entities—namely ***non-party*** Marvell Technology Group Ltd. ("MTGL") and ***non-party*** MAPL—as infringers at the negotiation table:

> Q. And what parties were at the table in this hypothetical negotiation?
>
> A. Well, ***I viewed it as Marvell as an integrated entity***, and France Telecom as an integrated entity.
>
> Q. What do you mean that Marvell is an integrated entity?
>
> A. ***Any entities or subsidiaries under the control of the Marvell corporation as a whole***. So, for example, there's one called -- I forget all these, I hate these abbreviations -- MIS or MIPS, MAPL. I mean, there's various subsidiaries, all of them integrated into a whole.
>
> Q. Okay. So you have an understanding, though, that Marvell Semiconductor is the only corporation that is being sued by France Telecom; correct?
>
> A. ***I understand that that might be a legal issue***. It's not something I pursued because I was treating the entity as an integrated whole.

(Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 23:19-24:13 (emphasis added); *see also* 24:14-21, 26:10-21, 59:17-60:7, 134:11-25, 268:2-9.).

His methodology plainly is unreliable and contrary to black letter patent law regarding the construct of the hypothetical negotiation. As this Court found in its April 14 order granting summary judgment to MSI, "[n]either MTGL nor MAPL are named defendants in this action" (D.I. 160 at 2-3) and, thus, those entities cannot be infringers at the hypothetical negotiation. Moreover, this Court has already ruled: that MSI "is not liable for the actions of a third party" (D.I. 160 at 23); that "there is no basis for holding [MSI] liable for any infringement by MAPL" (D.I. 160 at fn. 11; and, there is no basis "for letting the jury decide that [MSI] would have agreed to subject itself to damages caused by a separate legal entity." (D.I. 160 at 24). Accordingly,

Professor Cornell's proffered testimony is contrary to the law of the case and wholly irrelevant and unreliable.[2]

Because Professor Cornell relied on a legally erroneous construct of the hypothetical negotiation, he ultimately concluded that the negotiation would result in a lump sum payment to France Telecom of ▓▓▓ (Rycroft Decl. Ex. 2, Cornell Rpt. at ¶ 17). That conclusion grossly exaggerates the potential exposure of MSI at the hypothetical negotiation because he treated at least three entities—MSI, MTGL and MAPL—as infringers "by not removing any" from the negotiation. (Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 134:11-25). Why he did so is readily apparent—these entities were needed under his analysis to justify the ▓▓▓ ▓▓▓ payment France Telecom seeks:

> Q. Okay. So you just presumed that the hypothetical negotiation would happen during the acquisition, not at the time of first infringement?
>
> A. After the close of the acquisition. Yes.
>
> Q. Now, you also stated that as part of your opinion that even if an infringement occurred in 2007 or 2008 the damages would be the same; is that correct?
>
> A. I thought they would be very similar. Yes.
>
> Q. And what's your basis for that assumption?
>
> A. That even if you get into 2007 and early 2008, *the projected sales <u>on a global basis</u> still surpass what I computed to be the break-even number of units, which was about* ▓▓▓ *And if you surpass that, the optimal solution is to just take the normal lump sum license*.

(Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 39:24-40:17 (emphasis added); *see also* 81:3-22, 111:8-21, 123:10-13, 123:24-124:16, and Cornell Errata). Professor Cornell simply contorted his analysis of the hypothetical negotiation and the *Georgia-Pacific* factors to fit ▓▓▓

---

[2] Although Professor Cornell's expert report and testimony came before the Court issued its order on summary judgment, the issue was raised in MSI's motion for summary judgment filed February 27, 2014 and, although it would not have been entitled to do so, France Telecom never sought to supplement its expert reports on damages after the Court's order.

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Rycroft Decl. Ex. 4, Johnson Dep. Tr. (1/22/14)

3  at 148:17-149:3).

4  Indeed, Professor Cornell admitted that the ***only*** way to meet the ▮▮▮▮▮▮ "break-

5  even" point to justify his lump sum royalty of ▮▮▮▮▮ was to include both MSI and MAPL

6  sales. (Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 182:10-183:9). He also admitted that if

7  he considered MSI sales only, he did not believe he could meet the "break-even" point and then it

8  would be economically rational for MSI to opt for a running royalty like other licensees with

9  fewer 3G chip sales. (Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 147:17-148:19; Ex 5,

10 DDX37 (FT045643)). Indeed, France Telecom's own licensing agent and 30(b)(6) witness, Erik

11 Johnson, testified at his January 22, 2014 deposition that France Telecom's regular practice was

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13 (Rycroft Decl. Ex. 4, Johnson Dep. Tr. (1/22/14) at 184:10-17; *see also* Rycroft Ex. 6, FT043650-

14 51 at FT043651). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Rycroft Decl. Ex. 4, Johnson Dep. Tr. (1/22/14) at 184:13-17

19 (emphasis added)). Thus, not only did Professor Cornell use faulty methodology to conclude that

20 MSI would willingly agree to a license for an exorbitant lump sum payment, it ignores the facts.

21 Professor Cornell's faulty methodology is further demonstrated by the fact that he

22 admittedly relied on ***worldwide*** sales projections, rather than U.S. projections, in his analysis of

23 the hypothetical negotiation. (Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 40:18-41:2). In

24 relying on worldwide sales projections, he testified that he "thought it was the appropriate

25 criterion." (Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 40:18-21) However, his "criterion"

26 is in direct conflict with binding precedent from the Supreme Court, Federal Circuit, and district

27 courts holding that, as a matter of law, U.S. patents have no extraterritorial effect and that a

28 patentee cannot recover damages based on foreign activities. *Brown v. Duchesne*, 60 U.S. 183,

196 (1856) (Patents "were not intended to [] operate beyond the limits of the United States."); *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 441 (2007) ("It is the general rule under United States patent law that no infringement occurs when a patented product is made and sold in another country."); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013) (The patent laws "do not [ ] provide compensation for a defendant's foreign exploitation of a patented invention, which is not infringement at all."); *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1118 (N.D. Cal. 2011) (Alsup, J.) ("Patent infringement damages, therefore, must compensate only for the consequences of domestic activities."). Indeed, this Court already ruled on summary judgment, MSI "is not liable for any infringement that occurs outside the United States" (D.I. 160 at 24), and "France Telecom is not entitled to damages because the chips may ultimately end up and be used in the United States." (D.I. 160 at 29).

In addition to Professor Cornell's lump sum royalty analysis, at least the following alternative running royalty scenarios that he presented in his expert report include worldwide sales of the accused chips by both MSI and MAPL:

- "Marvell 3G Chips": [REDACTED]
- "Marvell 3G Chips Sold to RIM": [REDACTED]

(Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 83:4-84:1, 87:2-5). Because these alternative damages scenarios include worldwide sales and sales of non-party MAPL, they are necessarily faulty and unreliable, and should be excluded under the Court's previous summary judgment ruling and the law of the case.

### B. Professor Cornell's Reasonable Royalty Opinions Are Unreliable Because The Rely On Impermissible Speculation Regarding Use In The United States.

Each of Professor Cornell's damages opinions—including his lump sum damages theory, as well as his four alternative running royalty opinions—are also faulty and unreliable because he applied the wrong burden of proof to speculate that 100% of the accused chips were imported and used in an infringing manner in the United States.

France Telecom bears the burden of proof to quantify damages based on acts of infringement that actually occurred in the United States. *Uniloc*, 632 F.3d at 1315; *Lucent Techs.*,

580 F.3d at 1324. *Power Integrations* is instructive on this burden. 711 F.3d 1348, 1371 (Fed. Cir. 2013). There, the district court accepted an estimate that 18% of the accused devices made and sold overseas were eventually imported into the United States by third parties. *Id*. The Federal Circuit vacated the damages award because the assumption underlying the 18% estimate was logically flawed and part speculation, and held that the patentee establish the percentage of imported devices with some degree of certainty. *Id*. at 1374-76.

Here, Professor Cornell has made no effort to quantify the *actual* number or percentage of MSI's accused chips that are imported into the United States in third-party handsets and used in the United States in an allegedly infringing manner. Rather, Professor Cornell merely speculated that 100% of all chips sold by MSI somehow not only entered the United States but also were used in an infringing manner. At his deposition, Professor Cornell conceded that he simply included in his royalty calculation each and every chip sold despite the presence of any reliable proof of importation and actual usage:

> Q. And again, in order to reach the [redacted] approximate royalty payment, that assumes that all of those units were used in an infringing manner in the US; correct?
>
> \* \* \*
>
> A. Well, I assumed that all would be subject to the royalty agreement.
>
> Q. Well, part of the point of doing of patentee for actual use of their invention; correct?
>
> A. Well, you're starting to delve into these legal issues that I know they are in dispute here. But I really don't have an opinion on it. If you read my report, I just don't express an opinion on that, and I don't have one as I sit here.
>
> \* \* \*
>
> Q. Okay. But in order to get to the corresponding royalty payment for each of those hypothetical royalty bases, ***you assumed 100% of those units were used in an infringing manner***?
>
> A. Of the units shown --

* * *

A. ***Of the units shown, yes***, those would be subject to a royalty requirement.

(Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 88:17-89:25 (emphasis added); *see also* 88:11-89:7). There simply is no evidentiary basis for Professor Cornell's overinflated assumption that each and every accused chip in his damages calculations—whether sold in the United States or abroad—eventually entered into and was used in the United States in an allegedly infringing manner.

Professor Cornell speculated that 100% of all chips sold were used in an infringing manner, in part, because people may have travelled to the United States with their foreign handsets and then "roamed" on U.S.-based 3G networks:

> Q. And because you haven't made a specific assumption, your fallback position is 100% of those handsets could be used in the United States and therefore should be part of the calculus?
>
> A. ***That if you can't rule them out, they should be part of the calculation***. It is not saying that everyone is necessarily coming. But if you can't identify them, you don't get to reduce them.

(Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 212:19-213:1; *see also* 89:8-25, 211:4-212:2, 264:12-265:2). However, Professor Cornell's opinions on roaming by users are premised entirely on speculation and unverified assumptions. He assumes handsets purchased abroad "may" have been taken into the United States and "may" have been used. Yet he never states how exactly those handsets would have been used and whether such use, if it in fact did happen, would infringe. Indeed, Professor Cornell admits that he does ***not*** have reliable data regarding actual roaming use in the United States and that he provided no such data in his expert report:[3]

---

[3] France Telecom has agreed that it "will not use evidence of the extent of actual roaming of MSI accused chips in the quantification of reasonable royalty damages in the hypothetical negotiation." (Rycroft Decl. Ex. 9, August 11, 2014 Email from J. LoBue to E. Huang). France Telecom also has agreed not to introduce testimony beyond what is disclosed in Professor Cornell's report.

1  Q. Have you made any attempt to figure out how many accused chips were
2  actually used in the United States during the term of the '747 patent?
3  A. ███████████████████████████████████████████████████████
4  █████████████████████████████████. **But that's a very small sample**;
5  it's just France. **And that to me is the problem**. There's no way to track it. Once
6  they're made, there is no tracking device.
7                    \*       \*       \*
8  Q. And you didn't include any specific number in your report, did you?
9  A. No, because I didn't have it.
10 (Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 29:12-30:18; *see also* 30:18-35:14.) Indeed,
11 his opinions regarding roaming are limited to broad, generalized, self-serving statements—without
12 any proof or quantification—███████████████████████████████████████.
13 (Rycroft Decl. Ex. 2, Cornell Rpt. at ¶ 135; *see also* ¶ 194).
14     As in *Power Integrations*, "[i]n the end, we are left with an expert opinion derived from
15 unreliable data and built on speculation." 711 F.3d at 1374. Because each of Professor Cornell's
16 royalty scenarios is based on impermissible speculation that 100% of the accused chips—no
17 matter where they were sold—were actually imported and were used in the United States, they are
18 necessarily faulty and unreliable, and should be excluded in their entirety. Moreover, Professor
19 Cornell's testimony regarding the level of importation of foreign handsets into the United States
20 and alleged roaming in the United States is unreliable and speculative and should also be
21 precluded.

**C.    Professor Cornell Impermissibly Speculates on Actual Use By Using Third-Party Sales Numbers As A Proxy for Actual Use.**

With respect to his fourth alternative running royalty scenario[4], Professor Cornell relies on a document produced by BlackBerry that purports to summarize sales of its handsets into the United States from ███████████████. (Rycroft Decl. Ex. 7, BB_00001). This document, however, is flawed and unreliable.

Most notably, Professor Cornell admitted that the document does not ██████████ ████████████████████████████████████████████████████████████████ ██████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████████████████████████ (Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 91:12-22).

There is no question that MAPL was also a major supplier of chips to BlackBerry. (Rycroft Decl. Ex. 8, Matukaitis Decl. ¶¶ 26-27 (D.I. 135-18)). However, as previously discussed, France Telecom is precluded from seeking damages for sales of accused chips made by MAPL. (D.I. 160 at 27 ("Since there is no genuine issue of material fact that all sales of the accused chips [by MAPL] happened abroad, France Telecom is not entitled to damages because the chips may ultimately end up and be used in the United States.")) Professor Cornell's fourth alternative running royalty scenario includes all Blackberry handsets regardless of the supplier, thus impermissibly inflating the damages base to include ***non-infringing*** activities as a matter of law. *ResQNet.com*, 594 F.3d at 869 ("the damages inquiry must concentrate on compensation for the

---

[4] Professor Cornell's expert report identifies this scenario as "Marvell 3G Chips Sold to RIM, Which RIM Then Sold Into The US As Part of Assembled Handsets." (Rycroft Decl. Ex. 2, Cornell Rpt. at ¶ 22).

economic harm caused by infringement of the claimed invention"); *Power Integrations*, 711 F.3d at 1371 ("foreign exploitation of a patented invention … is not infringement at all"); D.I. 160 at 29.

Moreover, Professor Cornell also admitted that the BlackBerry sales document does not prove actual U.S.-based use of handsets, a requisite fact to prove infringement of the asserted claims of the '747 patent:



(Rycroft Decl. Ex. 3, Cornell Dep. Tr. (3/18/14) at 92:1-8). Thus, Professor Cornell mistakenly hinges his fourth alternative running royalty scenario on this BlackBerry sales data even though it does not prove U.S. use. This is counter to the requirement that damages for the infringement of method claims "ought to be correlated, in some respect, to the extent the infringing method is used" in the United States. *Lucent Techs.*, 580 F.3d at 1324.

As a result, Professor Cornell should be precluded from testifying with respect to his running royalty opinion that relies on the BlackBerry sales document, and should be precluded from opining that the sales may be used as a proxy for determining MSI accused chips that are eventually used in the United States in an infringing manner by unknown end users.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant MSI's motion and preclude Professor Cornell from presenting at trial: (1) his opinions on alternative damages scenarios that are based on worldwide sales and sales of non-party MAPL, including his opinion on the lump sum royalty, and his opinions on the two alternative running royalties that use "Marvell 3G Chips" and "Marvell 3G Chips Sold to RIM" as the base; (2) his opinions regarding the alleged level of

1 importation, use, and roaming use in the United States; and; (3) his opinions of the use of sales
2 data by BlackBerry as a proxy for alleged infringing use in the United States.

DATED: August 12, 2014                QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP


                                      By  */s/ Kevin P.B. Johnson*
                                         Kevin P.B. Johnson
                                         Edward J. DeFranco
                                         Raymond N. Nimrod
                                         Eric Huang
                                         Krista M. Rycroft

                                         Attorneys for
                                         MARVELL SEMICONDUCTOR, INC.