**Redacted Version of Document Sought To Be Sealed**

FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
Elliot E. Polebaum (*pro hac vice*)
elliot.polebaum@friedfrank.com
Joseph J. LoBue (*pro hac vice*)
joseph.lobue@friedfrank.com
801 17th Street, NW
Washington, DC  20006
Telephone: (202) 639-7000
Fax: (202) 639-7003

James W. Dabney (*pro hac vice*)
james.dabney@friedfrank.com
Henry C. Lebowitz (*pro hac vice*)
henry.lebowitz@friedfrank.com
One New York Plaza
New York, New York 10004-1980
Telephone: (212) 859-8000
Fax: (212) 859-4000

Attorneys for Plaintiff
FRANCE TELECOM, S.A.

FARELLA BRAUN + MARTEL LLP
Jeffrey M. Fisher (State Bar No. 155284)
jfisher@fbm.com
Alex Reese (State Bar No. 280530)
areese@fbm.com
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| France Telecom, S.A.,<br><br>        Plaintiff,<br><br>   *vs.*<br><br>Marvell Semiconductor, Inc.,<br>        Defendant. | Case No. 3:12-cv-4967-WHO<br><br>Date:      August 26, 2014<br>Time:      3:00 pm<br>Place:     Courtroom 2, 17th Floor,<br>             San Francisco Courthouse<br>Judge:    Hon. William H. Orrick |

**OPPOSITION TO *DAUBERT* MOTION TO EXCLUDE OPINIONS AND TESTIMONY
OF PROF. BRADFORD CORNELL**

**Redacted Version of Document Sought To Be Sealed**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ......................................................................................................1

II.     LEGAL STANDARD...............................................................................................3

III.    ARGUMENT.............................................................................................................4

     A.     Professor Cornell's Damages Calculations Comport With The Law And
          The Factual Record .........................................................................................4

          1.     Professor Cornell Offered A Proper *Ex Ante* Opinion...............................4

          2.     Professor Cornell Should Be Permitted To Offer His Lump Sum
               Opinion Regarding Marvell ......................................................................8

          3.     This Court's Summary Judgment Ruling Has No Relevance Or
               Bearing Upon Professor Cornell's Lump Sum Opinion ...........................11

          4.     Marvell Conflates And Misstates The Record In Contending That
               Professor Cornell Relies Upon "Worldwide" Sales Projections...............11

          5.     Marvell's Challenge To Professor Cornell's Lump Sum Opinion Is
               A Non Sequitur ......................................................................................13

     B.     Marvell's Assertion That The Reasonable Royalty Must Be Determined In
          Reference To Number Of "Uses" Of The Patented Methods Is Contrary
          To Law And Common Sense..........................................................................14

           1.     Marvell Has No Basis For Challenging Professor Cornell's
               Alternative Running Royalty Calculation Of €3.9 Million ......................15

           2.     Marvell Has No Basis For Challenging Professor Cornell's
               Alternative Running Royalty Calculation Of €2.4 Million ......................18

           3.     The Court Should Permit Professor Cornell To Testify Regarding
               His Alternative Running Royalty Calculation Of €12.3 Million...............20

     C.     In All Events, Professor Cornell Should Be Permitted To Testify
          Concerning The Non-Challenged Opinions Set Forth In His Report ...................21

IV.    CONCLUSION.........................................................................................................23

Redacted Version of Document Sought To Be Sealed

# TABLE OF AUTHORITIES

CASES

*Apple Inc. v. Motorola, Inc.,*
    -- F.3d --, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014) ..................3, 9, 10-11, 19-20, 23

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,*
    576 F.3d 1348 (Fed. Cir. 2009) ................................................................................8

*Carnegie Mellon Univ. v. Marvell Tech. Group Ltd.,*
    986 F. Supp. 2d 574 (W.D. Pa. 2013) ...............................................................16, 17

*Centillion Data Sys., LLC v. Qwest Comm. Int'l, Inc.,*
    631 F.3d 1279 (Fed. Cir. 2011) ............................................................................21

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ...............................................................................................3

*Georgia Pacific Corp. v. U.S. Plywood Corp.,*
    318 F. Supp. 1116 (S.D.N.Y. 1970) .......................................................................14

*H.M. Stickle v. Heublein,*
    716 F.2d 1550 (Fed. Cir. 1983) ...............................................................................7

*i4i Ltd. P'ship v. Microsoft Corp.,*
    598 F.3d 831 (Fed. Cir. 2010) .................................................................................3

*Interactive Pictures Corp. v. Infinite Pictures, Inc.,*
    274 F.3d 1371 (Fed. Cir. 2001) .......................................................................4-5, 14

*Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,*
    761 F.2d 649 (Fed. Cir. 1985) .................................................................................7

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ...............................................................................................3

*Lam, Inc. v. Johns-Manville Corp.,*
    718 F.2d 1056 (Fed. Cir. 1983) ...............................................................................7

*Lucent Techs., Inc. v. Gateway, Inc.,*
    580 F.3d 1301 (Fed. Cir. 2009) .....................................................4, 13-14, 16, 17

*MediaTek Inc. v. Freescale Semiconductor, Inc.,*
    11-CV-5341 YGR, 2014 WL 2854890, at *5 (N.D. Cal. June 20, 2014) ........................20

*Mformation Techs., Inc. v. Research in Motion Ltd.,*
    C 08-04990 JW, 2012 WL 1142537 (N.D. Cal. Mar. 29, 2012) ..............................3-4, 20

*Nickson Indus., Inc. v. Rol Mfg. Co.,*
    847 F.2d 795 (Fed. Cir. 1988) ............................................................................7, 20

*NTP, Inc. v. Research in Motion, Ltd.,*
    418 F.3d 1282 (Fed. Cir. 2005) ............................................................................21

OPPOSITION TO *DAUBERT* MOTION
3:12-CV-4967-WHO

Redacted Version of Document Sought To Be Sealed

*Panduit Corp. v. Stahlin Bros. Fibre Works,*
  575 F.2d 1152 (6th Cir. 1978) ...................................................................................7

*Powell v. Home Depot U.S.A, Inc.,*
  663 F.3d 1221 (Fed. Cir. 2011)................................................................................17

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
  711 F.3d 1348 (Fed. Cir. 2013)................................................................................18

*Primiano v. Cook,*
  598 F.3d 558 (9th Cir. 2010) .....................................................................................3

*Sealant Systems Int'l, Inc. v. TEK Global S.R.L.,*
  No. 5:11-cv-1649, 2014 WL 1008183 (N.D. Cal. Mar. 7, 2014) ........................8

*Story Parchment Co. v. Paterson Parchment Co.,*
  282 U.S. 555 (1931)....................................................................................................7

*Synthes USA, LLC v. Spinal Kinetics, Inc.,*
  No. 5:09-cv-01201, 2012 WL 4483158 (N.D. Cal. Sept. 27, 2012)...................... 7-8

*Telemac Corp. v. US/Intelicom, Inc.,*
  185 F. Supp. 2d 1084 (N.D. Cal. 2001) ....................................................................7

*TWM Mfg. Co. v. Dura Corp.,*
  789 F.2d 895 (Fed. Cir. 1986)..................................................................................14

*Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.,*
  425 F.3d 1366 (Fed. Cir. 2005)..................................................................................8

*WBIP, LLC v. Kohler Co.,*
  No. 11-10374-NMG, 2013 U.S. Dist. LEXIS 63789 (D. Mass. May 3, 2013) ..................8

*Zenith Corp. v. Hazentine,*
  395 U.S. 100 (1969)...................................................................................................17

**STATUTES**

35 U.S.C. § 284.....................................................................................................................23

**RULES**

Federal Rule of Evidence 702................................................................................................3

Redacted Version of Document Sought To Be Sealed

Plaintiff France Telecom, S.A. ("France Telecom") respectfully submits this brief in opposition to Defendant Marvell Semiconductor, Inc.'s ("Marvell") *Daubert* Motion to Exclude Opinions and Testimony of Professor Bradford Cornell (D.I. 187) ("Motion" or "Mot.").

## I.   INTRODUCTION

France Telecom has licensed the '747 Patent more than 50 times.  With respect to the 3G application at issue in this case, France Telecom has licensed the '747 Patent eight times.  The five volume suppliers of communications processors—Marvell's competitors—took lump sum licenses for amounts ranging between ███████████████.[1]  The three licensees selecting a running royalty license had *de minimis* sales or were exiting the business altogether.  Bradford Cornell, France Telecom's expert on damages—a professor of financial economics at Caltech, who holds a Ph.D. in financial economics from Stanford University—considered these comparable licenses and the other available evidence.  Professor Cornell determined that Marvell and France Telecom would have agreed to a lump sum license in the amount of €7.5 million in the so-called "hypothetical negotiation"—███████████████████████ ███████████████[2]

In reaching this conclusion, Professor Cornell employed the well established "*Georgia Pacific*" framework for determining the outcome of a hypothetical negotiation conducted just prior to the first infringement on or about November 8, 2006.  Professor Cornell's analysis is fully consistent with the Court's summary judgment ruling and addresses what <u>value</u> France Telecom and Marvell would have placed on a license to practice the '747 Patent in November 2006, based on the '747 patent's licensing history, Marvell's then-existing sales forecasts, and the economic benefits that Marvell stood to gain by licensing the '747 Patent.

Marvell's complaints about Professor Cornell considering the Marvell "integrated entity" are a side show.  Professor Cornell offered an opinion about Marvell, not Marvell Asia Pte., Ltd. ("MAPL") or some other "Marvell" entity.  At deposition, Professor Cornell referred

---

[1]   The five lump sum agreements are attached as Exhibits 3-7 of the Declaration of Eugene Hansen in Support of Plaintiff France Telecom, S.A.'s Opposition to *Daubert* Motion to Exclude Opinions and Testimony of Prof. Bradford Cornell ("Hansen Decl.").

[2]   Professor Cornell's February 14, 2014 expert report is attached as Exhibit 1 to the Hansen Declaration.

**Redacted Version of Document Sought To Be Sealed**

1  to the Marvell "integrated entity" only because the best available evidence, sales projections, do

2  not differentiate between Marvell and its affiliates.

3      Marvell, without regard to the interests of MAPL or any other "Marvell" entity, would

4  have taken a lump sum license for €7.5 million because, among other reasons:

5      • In 2006, ███████████████████████████████

6      ███████████████████████ (The '747 Patent did

7      not expire until August 29, 2012.)  (Hansen Decl., Ex. 9).

8      • Any reasonable potential licensee would have selected a lump sum license for

9      €7.5 million if it expected to sell around ███████████ to the United States.

10      (*Id.*, Ex. 1 ¶¶ 63-64, Ex. 6).

11      • ██████████████████████████████████████

12      ██████████████████████████████████████

13      ██████. (*Id.*, Ex. 1 ¶¶ 191, 197).

14      • ██████████████████████████████████████

15      ████████████████████████████████████ (*Id.*,

16      Ex. 1 ¶¶ 135-136, 193-195, 198).

17      • A lump sum license would benefit Marvell because "Marvell can sell its 3G

18      chips at a higher price (and achieve greater profit) by virtue of the fact that the

19      chips may be used in the United States even if sold elsewhere.  Value is added to

20      every chip by the fact that the methods of the '747 Patent may be practiced in the

21      United States."  (*Id.*, Ex. 1 ¶ 196).

22      Moreover, as set forth in Section III.B, below, Marvell's arguments with respect to

23  Professor Cornell's <u>alternative</u> running royalty calculations are specious and tailored to make

24  recovery of damages in this case impossible—even though the infringer bears the risk of

25  uncertainty in determining the quantum of damages.  For example, Marvell takes issue with

26  Professor Cornell for not tying his royalty base to "use" in the United States.  Marvell neglects

27  to alert this Court to the fact that ██████████████████████████████

28  ████████████.  Marvell fails to inform this Court that none of France Telecom's licenses

1   require a "royalty per use" of the patented methods.  Marvell fails to alert this Court to case law

2   holding that a royalty base need not be based on usage.  Marvell does not inform this Court that

3   its own expert rejected a royalty determined in reference to usage.  (Hansen Decl., Ex. 2 at 13,

4   14).  And Marvell fails to alert this Court that its own expert has offered an opinion regarding

5   two running royalty calculations that is the <u>exact same opinion</u> offered by Professor Cornell.

6   (*Id.*, Ex. 2 at Ex. 4, Sch. C).

7          The Court should deny Marvell's motion to exclude the opinions of Professor Cornell.

## II.     LEGAL STANDARD

9          The Court's gate-keeping function under Federal Rule of Evidence 702 and *Daubert v.*

10  *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), is limited to ensuring "the reliability

11  and relevancy of expert testimony."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

12  "[T]he test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily

13  nor exclusively applies to all experts or in every case."  *Id.* at 141.  "Shaky but admissible

14  evidence is to be attacked by cross examination, contrary evidence, and attention to the burden

15  of proof, not exclusion."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*,

16  509 U.S. at 596).

17         "That the gatekeeping role of the judge is limited to excluding testimony based on

18  unreliable principles and methods is particularly essential in the context of patent damages."

19  *Apple Inc. v. Motorola, Inc.*, -- F.3d --, 2014 WL 1646435, at *19 (Fed. Cir. Apr. 25, 2014).

20  "[Q]uestions regarding which facts are most relevant or reliable to calculating a reasonable

21  royalty are 'for the jury.'"  *Id.* (quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856

22  (Fed. Cir. 2010).  "It is common for parties to choose different, reliable approaches in a single

23  case and, when they do, the relative strengths and weaknesses may be exposed at trial or

24  attacked during cross examination.  That one approach may better account for one aspect of a

25  royalty estimation does not make other approaches inadmissible."  *Id.*

26         "In constructing a hypothetical negotiation, the Federal Circuit has 'consistently upheld'

27  the reliability of expert testimony where the expert considers the factors enumerated in

28  *Georgia–Pacific Corp. v. U.S. Plywood Corp.*"  *Mformation Techs., Inc. v. Research in Motion*

Redacted Version of Document Sought To Be Sealed

*Ltd.*, C 08-04990 JW, 2012 WL 1142537, at *3 (N.D. Cal. Mar. 29, 2012). "Because the negotiation at issue is hypothetical, any reasonable royalty analysis necessarily involves an element of approximation and uncertainty.... When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *Id.* (internal quotations and citations omitted).

## III.   ARGUMENT

### A.   Professor Cornell's Damages Calculations Comport With The Law And The Factual Record

Marvell first asserts that Professor Cornell applied "erroneous legal standards." He did not. Professor Cornell applied the widely accepted *Georgia Pacific* factors in an effort to determine what <u>Marvell</u> would have agreed to pay in a hypothetical negotiation for a license to practice the '747 Patent, which by definition is operative only in the United States. Applying these factors, he determined the <u>value</u> that France Telecom and Marvell would have placed on the United States rights in question and how that <u>value</u> would have been assessed.

#### 1.   Professor Cornell Offered A Proper *Ex Ante* Opinion

Federal Circuit precedent requires the expert in any "reasonable royalty" case, "as best as possible, to recreate the <u>*ex ante*</u> licensing negotiation scenario and to describe the resulting agreement." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) (emphasis added). In other words, "the negotiation must be hypothesized as of the time infringement began." *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384-85 (Fed. Cir. 2001). An infringer's forecasted sales, prior to first infringement, provide the best data point to determine both the infringer's willingness to enter into a lump sum license and the lump sum amount. Whether the infringer met its forecasted sales—a *post hoc*, unknowable fact at the time of the hypothetical negotiation—lacks import in determining a lump sum, reasonable royalty. *Id.* at 1385 ("The fact that [defendant] did not subsequently meet those projections is irrelevant to [defendant's] state of mind at the time of the hypothetical negotiation."); *id.* (rejecting defendant's argument that forecasts must correlate to actual sales

4

Redacted Version of Document Sought To Be Sealed

1  because "[s]uch a proposition would essentially eviscerate the rule that recognizes sales

2  expectations at the time when infringement begins as a basis for a royalty base as opposed to an

3  after-the-fact counting of actual sales").

4      Marvell does not fault Professor Cornell for relying upon projected sales to determine

5  the amount of any lump sum license (nor could it).  Marvell instead attempts to create the false

6  impression that Professor Cornell aggregated the projections of Marvell, Marvell Technology

7  Group, Ltd. ("MTGL") (the Bermuda parent holding company), and MAPL to arrive at his

8  opinion that Marvell would have agreed to a lump sum license of €7.5 million.  For example,

9  Marvell asserts that "Professor Cornell simply contorted his analysis of the hypothetical

10  negotiation and the *Georgia-Pacific* factors to fit the 40 million unit break-even point identified

11  by France Telecom. . . ." Mot. at 6-7.  Professor Cornell did no such thing.

12      Professor Cornell offers the opinion that in a hypothetical negotiation in late 2006,

13  before first infringement, France Telecom and Marvell would have valued a license to practice

14  the '747 Patent in reference to the then-existing forecasts of the total unit volumes of infringing

15  communications processors.  (Marvell entered the communications processor business in

16  November 2006 after its parent company, MTGL, completed its acquisition of Intel

17  Corporation's communications processor assets.)



18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO *DAUBERT* MOTION
3:12-CV-4967-WHO

**Redacted Version of Document Sought To Be Sealed**

Likewise, Sehat Sutardja, the CEO of MTGL and Marvell, did not differentiate between Marvell and MAPL when he announced the planned Intel transaction on June 27, 2006, and stated that "Marvell's" intent was to become "the leading supplier[] in 3G" communications processors. (Hansen Decl. Ex. 14 at FT051533). Mr. Sutardja did not distinguish between Marvell and MAPL when he stated that "the 3G WCDMA is going to be a huge opportunity for us to grab." (*Id.* at FT051539). And Mr. Sutardja did not distinguish between Marvell and MAPL when, on November 8, 2006, he stated that "Marvell's mission is to be a long-term, leading supplier in the cellphone and consumer electronics markets." (*Id.*, Ex. 15). To the contrary, the Marvell press release setting forth Mr. Sutardja's quote states that "the terms 'company' and 'Marvell' refer to [MTGL] and its subsidiaries, including Marvell Semiconductor, Inc. (MSI) [and] Marvell Asia Pte Ltd. (MAPL). . . ." (*Id.*).

Professor Cornell's opinions and deposition testimony are fully consistent with the *Georgia-Pacific* analytical framework. Professor Cornell looked to the best available evidence regarding projected sales at the relevant time, in late 2006, to estimate the value that Marvell and France Telecom would place on a prospective license to practice the '747 Patent in the United States. France Telecom could reasonably have taken the position, and Marvell could reasonably have concluded, that a license to practice the '747 Patent was necessary if Marvell were to be able to make any of the sales it was forecasting in 2006; and given the sales volumes stated above, it would have been logical and rational for Marvell to take a fully paid-up license as its similarly situated rivals had done. In 2006, Marvell would have expected a running royalty license to be more expensive than a lump sum license.

Professor Cornell's opinion regarding a 2006 hypothetical license negotiation is not undermined by treating Marvell's 2006 sales forecasts as the relevant ones. Those forecasts do

**Redacted Version of Document Sought To Be Sealed**

1   not refer to MAPL and do not purport to distinguish between sales or offers to sell by Marvell or

2   MAPL. As of 2006 it was completely unknown what specific corporate entity would make

3   offers to sell or sell the products that Marvell was putting forward in its sales projections.

4   Professor Cornell stated in his deposition that he considered the "integrated" Marvell

5   entity at the hypothetical negotiation because Marvell's forecasts do not differentiate projected

6   sales as between Marvell and MAPL. Professor Cornell would have considered any Marvell-

7   specific projections and presented an opinion with respect to them, but none were available.

8   This does not render Professor Cornell's lump sum opinion legally "erroneous." As

9   infringer, Marvell bears the risk regarding the absence of specificity in the Marvell projections.

10   "[W]here it is impossible to make a mathematical or approximate apportionment between

11   infringing and non-infringing items, the infringer must bear the burden and the entire risk."

12   *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 799 (Fed. Cir. 1988) (internal quotation and

13   citations omitted); *H.M. Stickle v. Heublein*, 716 F.2d 1550, 1563 (Fed. Cir. 1983) ("As a final

14   matter we would add that the trial court may award an amount of damages greater than a

15   reasonable royalty so that the award is 'adequate to compensate for the infringement'" because

16   the infringer should not be "in a 'heads-I-win, tails-you-lose' position.") (quoting *Panduit Corp.*

17   *v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1158 (6th Cir. 1978); *Kori Corp. v. Wilco Marsh*

18   *Buggies & Draglines, Inc.*, 761 F.2d 649, 655 (Fed. Cir. 1985) ("Fundamental principles of

19   justice require us to throw any risk of uncertainty upon the wrongdoer rather than upon the

20   injured party.") (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555

21   (1931)); *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983) ("Moreover,

22   when the amount of the damages cannot be ascertained with precision, any doubts regarding the

23   amount must be resolved against the infringer."); *Telemac Corp. v. US/Intelicom, Inc.*, 185 F.

24   Supp. 2d 1084, 1099-1100 (N.D. Cal. 2001) ("Any uncertainty in calculating a damages award

25   is to be resolved against the infringer.") (internal quotes and citations omitted).

26   In all events, even if it could have been foreseen that an affiliate of Marvell might have

27   made some of the projected sales, consideration of related corporate entities in the hypothetical

28   negotiation "reflects economic reality." *Synthes USA, LLC v. Spinal Kinetics, Inc.*, No. 5:09-cv-

Redacted Version of Document Sought To Be Sealed

1   01201, 2012 WL 4483158, at *12 (N.D. Cal. Sept. 27, 2012) (accepting plaintiff's expert's

2   testimony that the negotiating party would be "the Synthes organization as a whole"); *see also,*

3   *e.g., Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1378

4   (Fed. Cir. 2005) (district court properly considered sales of corporate parent in hypothetical

5   negotiation because "the holding company would not enter any negotiation without considering

6   the competitive position of its corporate parent"), *overruled on other grounds by Cardiac*

7   *Pacemakers, Inc. v. St. Jude Medical, Inc.*, 576 F.3d 1348 (Fed. Cir. 2009); *Sealant Systems*

8   *Int'l, Inc. v. TEK Global S.R.L.*, No. 5:11-cv-00774-PSG, 2014 WL 1008183, at *33-34 (N.D.

9   Cal. Mar. 7, 2014) ("The court also credits [expert's] consideration of the interests of AMI's

10  closely-related sister company, SSI, at the hypothetical negotiation. . . . The case law confirms

11  that AMI may consider the effect of the license on SSI at the hypothetical negotiation.  It is of

12  no moment that AMI and SSI are sister companies and do not stand in a parent-subsidiary

13  posture."); *WBIP, LLC v. Kohler Co.*, No. 11-10374-NMG, 2013 U.S. Dist. LEXIS 63789, at *2

14  (D. Mass. May 3, 2013) (overruling objection to plaintiff's damages expert and noting that, in

15  the hypothetical negotiation, "WBIP would properly consider the impact that a license

16  agreement would have upon its affiliate, Westerbeke Corp.").

17      To the extent Marvell contends that, in November 2006, France Telecom and Marvell

18  would have agreed to license the '747 Patent on the basis of non-existent information (i.e.,

19  non-existent forecasts of future transactions), that is a matter of proof at trial.

20          **2.      Professor Cornell Should Be Permitted To Offer His Lump Sum**
            **Opinion Regarding Marvell**
21
22      Ample evidence supports Professor Cornell's opinion that in November 2006 Marvell

23  would have agreed to take a €7.5 million, fully paid up license to practice the '747 Patent and

    thereby gain entrance into a lucrative and fast-growing business.   The facts supporting this
24
    conclusion include the following:
25
        •   █████████████████████████████████████████
26
27
28

**Redacted Version of Document Sought To Be Sealed**

1    ████ (The '747 Patent did not expire until August 2012.)  (Hansen Decl. Ex. 9,

2    Ex. 12 at MSIFT00046096).[3]

3    • Mr. Sutardja, the CEO of Marvell and MTGL, stated that Marvell intended to

4    become "the leading supplier" of 3G communications processors.  (Hansen Decl.

5    Ex. 1 ¶¶ 20, 182).

6    • ████████████████████████████████████████

7    ████████ (*Id.*, Ex. 1 ¶¶ 20, 33-36, 182-194).

8    • All of the volume suppliers—Marvell's competitors—took a lump sum license

9    for between ████████████.  (*Id.*, Ex. 1 ¶¶ 20, 51-129, 176).  *See*

10   *Apple*, 2014 WL 1646435, at *29 ("As we have held many times, using

11   sufficiently comparable licenses is a generally reliable method of estimating the

12   value of a patent.").

13   • A lump sum license for €7.5 million is the most economical choice for any

14   licensee projecting that approximately ████████ (or more) will be sold or

15   distributed in the United States.  (*Id.*, Ex. 1 ¶¶ 63-64, 197, Ex. 6).

16   • Marvell would have expected much more than ████ of its communications

17   processors to have been sold in the U.S. ████████████████████

18   ████████████████████████████████████████

19   ████████████████████████ and (ii) BlackBerry

20   achieved a significant portion of its overall revenue (65% in 2006) from the U.S.

21   (*Id.*, Ex. 1 ¶¶ 191, 198).

22   • ████████████████████████████████████████

23   ████████████████████████ (*Id.*, Ex. 1 ¶ 57).

24

25

26

---

27   [3]   Professor Cornell did not have the opportunity to examine this document as part of his
expert report because Marvell failed to produce it until after the close of all discovery and after
28   Professor Cornell's report had been submitted.  However, Professor Cornell noted and stressed
the importance of this document in his deposition.

9                                    OPPOSITION TO *DAUBERT* MOTION
                                        3:12-CV-4967-WHO

**Redacted Version of Document Sought To Be Sealed**

- Tracking and monitoring end customer use of communications processors is impossible as a practical matter and has not historically been a basis of royalties for the '747 Patent. (*Id.*, Ex. 1 ¶¶ 135-136, 193-195, 198).

- With a license under the '747 Patent, Marvell could sell 3G chips at a higher price (and achieve greater profit) by virtue of the fact that the chips may be used in the United States even if sold elsewhere. (*Id.*, Ex. 1 ¶ 196).

- Marvell wanted and sought a lump sum license from France Telecom in negotiations. ███████████████████████████████████████ ██████████████████████████████. (*Id.*, Ex. 1 ¶¶ 40, 43, 44, 62, 96, 107, 137, 180).

- A lump sum license would avoid substantial costs of monitoring, auditing, accounting, and administration. (*Id.*, Ex. 1 ¶¶ 20, 64).

- A reasonable chipset manufacturer would seek a broad, lump sum license, covering all chipsets manufactured by it, given the portability of smartphones. (*Id.*, Ex. 1 ¶ 135).

France Telecom here seeks damages for Marvell's infringement in the United States; and the question is what amount <u>Marvell</u> would have agreed to pay France Telecom in a hypothetical royalty negotiation conducted in November 2006, long before any "foreign sales by MAPL" would have occurred. Marvell is free to try and persuade the jury that, in November 2006, it would have had a pessimistic, rather than an optimistic, view of its future sales prospects and so would have opted to take a "running" royalty agreement and exposure to royalty obligations much greater than the €7.5 million paid-up license ████████████ ███████████████████████ (and that France Telecom's FRAND obligation required be paid by a licensee in Marvell's position). But that is a factual issue for the jury to decide, not a question of whether Professor Cornell applied the correct legal standard. *Cf Apple*, 2014 WL

OPPOSITION TO *DAUBERT* MOTION
3:12-CV-4967-WHO

Redacted Version of Document Sought To Be Sealed

1646435 at *19 ("This court has recognized that questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'") (citation omitted).[4]

### 3.   This Court's Summary Judgment Ruling Has No Relevance Or Bearing Upon Professor Cornell's Lump Sum Opinion

Finally, Professor Cornell's lump sum opinion is not contrary to the "law of the case," as Marvell incorrectly contends.   Mot. at 5-6.   In moving for summary judgment, Marvell challenged only two of Professor Cornell's four "running royalty" calculations.   The limited nature of Marvell's motion was demonstrated by Marvell's citation only to paragraph 22 and Exhibits 4 and 5 of Professor Cornell's expert report, provisions which concern Professor Cornell's running royalty calculations.   (D.I. 135-3.)   Moreover, Marvell's proposed order sought summary judgment only with respect to "sales of the accused chips transacted by [MAPL], and the exclusion of plaintiff France Telecom S.A.'s claim to damages stemming from the extraterritorial sales of the accused chips."   (D.I. 135-24 (emphasis added).)   Professor Cornell's *ex ante* opinion on the lump sum amount does not consider sales, either extraterritorial sales or alleged MAPL sales, because sales (an unknowable, *post hoc* fact at the time of the hypothetical negotiation) are irrelevant.

The Court ruled that France Telecom could not recover damages for actual foreign sales and/or actual sales made by MAPL.   The Court did not address Professor Cornell's lump sum opinion, which is not based on sales.

### 4.   Marvell Conflates And Misstates The Record In Contending That Professor Cornell Relies Upon "Worldwide" Sales Projections

Marvell seeks to confuse the record when it contends that Professor Cornell "admittedly relied on worldwide sales projections, rather than U.S. projections, in his analysis of the hypothetical negotiation," and therefore his lump sum opinion is "faulty and unreliable."   Mot.

---

[4]   Marvell conflates the record when it contends that Professor Cornell supposedly "█████████████████████████████████████████████████████" Mot. at 7.   Actual sales are irrelevant to the lump sum analysis; only sales projections are relevant.   ███████████████████████████████████████████████████████████████████████████████).   But applying the correct, *ex ante* analysis, the projections support a lump sum license.

OPPOSITION TO *DAUBERT* MOTION
3:12-CV-4967-WHO

**Redacted Version of Document Sought To Be Sealed**

1    at 7-8.  In making this assertion, Marvell fails to inform the Court that there are no "U.S." sales

2    projections; there are only undifferentiated sales projections.  (Hansen Decl., Ex. 1 ¶ 192 ("No

3    documents have been produced indicating Marvell's forecasted sales to the United States.")).

4    Marvell also fails to inform the Court that Professor Cornell testified that he considered the

5    undifferentiated sales projections an "appropriate criterion" because he "didn't see any way of

6    distinguishing territories."  (*Id.*, Ex. 20 at Tr. 40:18-41:2).  Marvell further fails to bring to this

7    Court's attention Professor Cornell's deposition testimony in which Professor Cornell explained

8    that, because ████████████████████████████████████████████████████████████████

9    █████, Marvell would have wanted a lump sum license for €7.5 million,

10   ████████████████████████████████████████████████████████.  (*Id.*, Ex. 20 at

11   Tr. 205:22-206:16).

12         Marvell otherwise fails to address Professor Cornell's <u>opinions</u>, set forth in his expert

13   report.  Professor Cornell's expert report explains the fundamental problem facing Marvell in

14   the hypothetical negotiation: ███████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████.  (*Id.*, Ex. 1 ¶¶ 194-195).  But

17   Marvell does want its customers and end users to know that devices with Marvell chips can be

18   used "worldwide" or "wherever they go," including the United States. (*Id.*, Exs. 21-22).

19   ████████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████████████

23   (given France Telecom's standard running royalty rates for the 3G application, which could

24   neither increase nor decrease materially in light of France Telecom's FRAND obligations).

25   Professor Cornell accordingly concludes:

26   ████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████████

**Redacted Version of Document Sought To Be Sealed**

████████████████████████████████████████████████

(*Id.*, Ex. 1 ¶ 197).

Professor Cornell sets forth numerous other points in his report supporting the conclusion that Marvell would have taken the lump sum license for €7.5 million, none of which has any relationship to "worldwide" sales.  For example, Professor Cornell notes that Marvell "would have wanted flexibility to sell as many units in the United States as possible, given the importance of the United States market"—"████████████████████████████████

████████████████████████████████████████████████

████████████████"  (*Id.*, Ex. 1 ¶ 198).  Professor Cornell also explains that "Marvell can sell its 3G chips at a higher price (and achieve greater profit) by virtue of the fact that the chips may be used in the United States even if sold elsewhere.  Value is added to every chip by the fact that the methods of the '747 Patent may be practiced in the United States."  (*Id.*, Ex. 1 ¶ 196). Professor Cornell also notes that Marvell intended "to lead the cell phone market's transition through 3G solutions as the leading supplier in the cell phone market," which includes the U.S. market.  (*Id.*, Ex. 1 ¶¶ 20, 182).  The United States market was the most important market for BlackBerry, Marvell's overwhelmingly largest customer, given that BlackBerry achieved 65% of its revenue in the U.S. for the relevant time period.  (*Id.*, Ex. 1 ¶¶ 187-189, 191).

### 5.    Marvell's Challenge To Professor Cornell's Lump Sum Opinion Is A Non Sequitur

Marvell claims that "[e]ach of Professor Cornell's damages opinions—including his lump sum damages theory"—should be precluded because Professor Cornell supposedly "made no effort to quantify the <u>actual</u> number or percentage of MSI accused chips" used in the United States.  Mot. at 8, 9 (emphasis in original).  Marvell tellingly fails to explain why Professor Cornell's lump sum opinion should be precluded on this ground, and for good reason.

As noted above, to determine the outcome of the hypothetical negotiation, the law requires an *ex ante* analysis, focusing on the facts and circumstances <u>at the time of first infringement</u>.  *See, e.g., Lucent*, 580 F.3d at 1325 ("The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting

13                        OPPOSITION TO *DAUBERT* MOTION
3:12-CV-4967-WHO

Redacted Version of Document Sought To Be Sealed

1    agreement.") (emphasis added); *Interactive Pictures*, 274 F.3d at 1384-85 ("When that
2    [hypothetical negotiation] framework is employed, the negotiation must be hypothesized as of
3    the time infringement began."); *Georgia Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp.
4    1116, 1123 (S.D.N.Y. 1970) ("In February 1955, USP had no reason to anticipate that there
5    would be a significant decline in the demand for Weldtex in the foreseeable future. In fact, no
6    such decline took place for two years subsequent to February 1955.").

7        The *ex ante* analysis means that what "actually" happened lacks import, because what
8    "actually" happened can be known only in hindsight. For this reason, the "actual" sales and
9    "actual" use of Marvell chips in the United States do not determine the outcome of the
10   hypothetical negotiation. For purposes of determining the lump sum, the question is Marvell's
11   projected sales and projected use of Marvell chipsets. Here, the Marvell projections, Marvell's
12   stated intent to become "the leading supplier" of 3G-capable chips, and BlackBerry's significant
13   U.S. presence (among other facts) all support a lump sum license of €7.5 million—as Professor
14   Cornell explains at length in his report.

15   **B.    Marvell's Assertion That The Reasonable Royalty Must Be Determined In
16   Reference To Number Of "Uses" Of The Patented Methods Is Contrary To
     Law And Common Sense**

17       Separate from his lump sum opinion, Professor Cornell has provided calculations of
18   what France Telecom would be entitled to recover if it elected to press an "analytical approach"
19   to damages, *see TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986), based on the
20   magnitude of Marvell's actual infringement between 2006 and 2012. Marvell contends that
21   Professor Cornell's alternative running royalty damages opinions should be excluded, because
22   Professor Cornell does not tie his damages numbers to "use" in the United States and
23   "speculate[s] that 100% of the accused chips were imported and used in an infringing manner in
24   the United States." Mot. 8-13. This contention requires brass given that Professor Cornell and
25   Marvell's own expert, Julie Davis, have put forward the exact same running royalty analysis.

26
27
28

Redacted Version of Document Sought To Be Sealed

1.   **Marvell Has No Basis For Challenging Professor Cornell's Alternative Running Royalty Calculation Of €3.9 Million**

As an alternative to his lump sum opinion, Professor Cornell set forth four alternative running royalty calculations.  (Hansen Decl., Ex. 1 ¶ 22, Exs. 5A-5F).  One of Professor Cornell's royalty bases considers <u>only</u> those communications processors (i) for which <u>Marvell recognized revenue</u> on sales (not MAPL or any other "Marvell" entity) and (ii) <u>shipped to the United States</u>.  Professor Cornell excluded all communications processors shipped to countries other than the United States.  This royalty base of more than ███████ chipsets yields damages of €3,919,060 million.  (Hansen Decl. Ex. 1 at Ex. 5E.)  Marvell's expert, Julie Davis, put forward <u>the exact same running royalty opinion</u> in her expert report.  Ms. Davis justified this opinion by explaining that Marvell communications processors shipped to the United States provided a "proxy for those units used in the U.S." (*Id.*, Ex. 2. at 14.)  Ms. Davis sets forth this calculation at Exhibit 4, Schedule C, imaged below:



Professor Cornell and Ms. Davis agree on every aspect of this potential damage number, including the number of Marvell units sold into the United States and the applicable rates.[5]

---

[5]   The only disagreement concerns Ms. Davis's opinion that the running royalty should be "capped" at her lump sum amount, based on the so-called Book of Wisdom.  Ms. Davis should be precluded from offering this "cap" opinion because it is contrary to the requirement that she put forward an *ex ante* analysis.  *See* Plaintiff's Motion in Limine (D.I. 184) at 5-10.

**Redacted Version of Document Sought To Be Sealed**

1   Marvell's purported grounds to exclude Professor Cornell for offering the exact same

2   opinion as its own expert are not well taken.  First, Marvell has adopted the opinion of Ms.

3   Davis by referencing her expert report in its interrogatory response.  (Hansen Decl., Ex. 13 at

4   39, 40).  Marvell should be estopped from challenging an analysis and damages quantification

5   that it has adopted as correct.

6   Second, Marvell's contention that the running royalty base must be determined in

7   reference to "actual use" in the United States, as opposed to some other benchmark (such as

8   shipments to the United States), misstates the law and fails the common sense test.  The '747

9   Patent sets forth method claims, and is infringed when the patented methods are practiced in the

10  United States.

11

12  .  (Hansen Decl., Ex. 8 at Tr. 41:4-9, 42:6-10, 44:25-

13  45:20).

14  (*Id.*, Ex. 2 at 13, 14).  The

15  result of the hypothetical negotiation could never be a "fee per United States use"

16  .

17  Nor would such a fee be workable in the real world.  One U.S. user could practice the

18  patented methods dozens or even hundreds of times per day (e.g., by sending emails, pictures,

19  downloading or uploading data from his or her smartphone).  Tens of millions of infringing acts

20  likely occurred each day, and hundreds of millions of acts of U.S. infringement (or more) likely

21  occurred over the life of the '747 Patent.  How could the parties ever attempt to assign value to

22  such "usage"?  Would each usage require a fee of 1/100 of a penny?  1/1,000 of a penny?

23  1/10,000 of a penny?  Administering any such system, involving millions upon millions of

24  "uses" otherwise would be impractical if not impossible.  *See, e.g., Lucent*, 580 F.3d at 1334

25  ("The administrative cost of monitoring usage can be prohibitively expensive."); *Carnegie*

26  *Mellon University v. Marvell Tech. Group Ltd.*, 986 F. Supp. 2d 574, 636 (W.D. Pa. 2013)

27  (rejecting a per-usage running royalty because "quantifying a per use fee in this case is nearly

28  impossible").

**Redacted Version of Document Sought To Be Sealed**

1    For these reasons, the Federal Circuit does not require a royalty base determined in

2  reference to United States usage. The parties may agree upon a reasonable proxy for use in the

3  hypothetical negotiation, including by valuing the <u>right to use</u> the patented invention in the

4  United States. The Court in *Lucent* addressed this issue squarely:

> 5    [W]e have never laid down any rigid requirement that damages in all
> circumstances be limited to specific instances of infringement proven with direct
> 6    evidence. Such a strict requirement could create a hypothetical negotiation far
> removed from what parties regularly do during real-world licensing negotiations.
> 7    As shown by the evidence in this case, companies in the high-tech computer
> industry often strike licensing deals in which the amount paid for a particular
> 8    technology is not necessarily limited to the number of times a patented feature is
> used by a consumer. A company licensing a patented method often has strong
> 9    reasons not to tie the royalty amount strictly to usage. The administrative cost of
> 10    monitoring usage can be prohibitively expensive. Furthermore, with some
> inventions, say for example a method of detecting fires, value is added simply by
> 11    having the patented invention available for use.

12  580 F.3d at 1334; *see also Powell v. Home Depot U.S.A, Inc.*, 663 F.3d 1221, 1240 (Fed. Cir.

13  2011) ("we have held that when considering the amount of a use-based reasonable royalty

14  adequate to compensate for the infringement, 35 U.S.C. § 284, a jury may consider not only the

15  benefit to the patentee in licensing the technology, but also the value of the benefit conferred to

16  the infringer by use of the patented technology"); *Zenith Corp. v. Hazentine*, 395 U.S. 100, 138

17  (1969) ("It could easily be . . . that the licensee as well as the patentee would find it more

18  convenient and efficient from several standpoints to base royalties on total sales than to face the

19  burden of figuring royalties based on actual use"); *Carnegie Mellon*, 986 F. Supp. 2d at 643

20  ("[T]he jury could have properly considered as illogical an agreement to a per chip royalty

21  predicated on an analytic neither party knows or tracks, and, depending on estimates, could vary

22  by millions.").

23    The 50+ licenses that France Telecom has entered into regarding the '747 Patent provide

24  one solution to the impracticality, if not impossibility, of setting a per-use fee. Those licenses

25  require licensees to pay a running royalty based on "Sales" in patent territories. The licenses

26  broadly define "Sale," and therefore the licensee's royalty obligation, as "any sale, rental, lease,

27  <u>exportation even without any compensation</u>, or <u>other form of distribution of a product in a</u>

28  <u>[patent] Territory</u>." (Hansen Decl., Ex. 23 at Art. 1.1.18). Here, in addition to being a United

**Redacted Version of Document Sought To Be Sealed**

1  States "sale," shipping ████ Marvell communications processors to the United States is a

2  "form of distribution of a product in a Territory."  Moreover, to the extent that these Marvell

3  communications processors later were exported to Mexico, as Marvell apparently believes, then

4  there was "exportation [from the United States] even without any compensation."   France

5  Telecom's license agreements for the '747 Patent support Professor Cornell's conclusion (and

6  Ms. Davis's conclusion) that Marvell would have agreed to pay a running royalty for at least the

7  ████ Marvell chips shipped directly to the United States.

8         Marvell speculates that not all ████ processors may have been "used" in the United

9  States (████████████████████████████████

10 ████████████).  But the question

11 is not whether there were ████ "uses" or "acts of infringement" in the United States.

12 Nobody buys a $300 smartphone and uses it once.  If just 1,000,000 phones were "used" in the

13 United States, those same 1,000,000 phones may have infringed the '747 Patent hundreds of

14 millions, indeed billions, of times.  The question is how to value the <u>right to use</u> the patented

15 methods in the U.S., when usage cannot be tracked.  The France Telecom licenses provide one

16 solution adopted by both damages experts in this case.

17        The Federal Circuit's decision in *Power Integrations, Inc. v. Fairchild Semiconductor*

18 *Int'l, Inc.*, 711 F.3d 1348 (Fed. Cir. 2013), has no relevance to Marvell's argument.  There, the

19 court rejected as speculative an estimate that 18% of accused devices sold overseas were

20 imported into the United States.  This case presents no such concern.  With respect to Professor

21 Cornell's running royalty damages calculation of €3.9 million, Marvell's documents establish—

22 and Marvell's expert agrees—that 100% of the Marvell communications processors were

23 shipped directly to the United States. (Hansen Decl., Ex. 1 at Ex. 5E; Ex. 2 at Ex. 4, Sch. C).

    **2.**    **Marvell Has No Basis For Challenging Professor Cornell's Alternative Running Royalty Calculation Of €2.4 Million**

25     Marvell also challenges Professor Cornell's alternative running royalty calculation of

26 €2.4 million, which Professor Cornell determined in reference to data provided by BlackBerry

27 in discovery showing that, for the relevant time period, ████████████

28

**Redacted Version of Document Sought To Be Sealed**

1 ███████████████████████████████████████████. Marvell

2 claims that this opinion, too, should be excluded because it does not differentiate between

3 "Marvell" and "MAPL" communications processors (█████████████████████████

4 ████████████████████████████████████████████████████████

5 ████████████████████████████). Mot. at 12-13.

6      Marvell again neglects to inform the Court that its own expert has offered a running

7 royalty opinion based upon this very document.   Ms. Davis explained that she considered

8 BlackBerry's U.S. sales a reasonable proxy for determining the running royalty because

9 (i) "█████████████████████████████████████████████████████

10 ███████████████████████████████████

11 ████" (Hansen Decl. Ex. 2 at 13,.14 (emphasis in original).) Ms. Davis's opinion matches

12 Professor Cornell's opinion in every respect, including regarding rates and royalty base.

13 *Compare* Cornell Ex. 5F (Ex. 1 of Hansen Decl.) *with* Davis Ex. 4, Sch. C (Ex. 2 of Hansen

14 Decl.).

15      Marvell also neglects to inform the Court that Marvell did more than just adopt Ms.

16 Davis's opinion in its interrogatory responses.   Marvell incorporated the referenced BlackBerry

17 document, BB00001, as "relevant" and as part of its response to an interrogatory asking Marvell

18 to describe "the facts and legal bases that Marvell will rely on to support any calculation of

19 damages." (Hansen Decl., Ex. 13 at 49). The document cannot be "relevant" to determine the

20 calculation of damages and, at the same time, "flawed and unreliable."

21      In all events, Marvell again misstates the controlling legal standard.   Professor Cornell

22 relied upon the best available evidence—the same evidence acknowledged by Marvell as

23 "relevant" to the damages calculation. Courts do not exclude experts for citing to and relying

24 upon the best available information, particularly when the opposing party has conceded

25 relevance. Marvell will have every opportunity to cross examine Professor Cornell with respect

26 to his reliance upon the BlackBerry data. *See, e.g., Apple*, -- F.3d --, 2014 WL 1646435, at *19

27 ("This court has recognized that questions regarding which facts are most relevant or reliable to

28 calculating a reasonable royalty are 'for the jury.'") (citation omitted); *id.* at *23

OPPOSITION TO *DAUBERT* MOTION
3:12-CV-4967-WHO

1    ("disagreements about the factual underpinnings of an expert's analysis go to weight, not

2    admissibility") (citation omitted); *MediaTek Inc. v. Freescale Semiconductor, Inc.*, 11-CV-5341

3    YGR, 2014 WL 2854890, at *5 (N.D. Cal. June 20, 2014) ("[Infringer's] quarrels with this

4    [expert testimony] evidence are not a basis for its exclusion, but are disagreements and

5    credibility challenges that can be clarified on cross-examination."); *Mformation Techs., Inc.*, C

6    08-04990 JW, 2012 WL 1142537, at *3 (N.D. Cal. Mar. 29, 2012) ("When the methodology is

7    sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the

8    degree of relevance or accuracy (above this minimum threshold) may go to the testimony's

9    weight, but not its admissibility."). In all events, Marvell bears the risk of any uncertainty in the

10   BlackBerry sales document. *See Nickson*, 847 F.2d at 799 ("[W]here it is impossible to make a

11   mathematical or approximate apportionment between infringing and non-infringing items, the

12   infringer must bear the burden and the entire risk."); *supra* at 7 (citing cases).

13          Finally, Marvell's contention that Professor Cornell should be excluded from offering

14   his running royalty opinion because "sales" in the United States do not equate to "use" in the

15   United States is again without merit.  Mot. at 13. ████████████████████████████

16   ████████████████, as noted above, the law permits the parties to agree upon a proxy royalty

17   base rather than a "fee per United States use."

18          ### 3.    The Court Should Permit Professor Cornell To Testify Regarding

19          His Alternative Running Royalty Calculation Of €12.3 Million

20   Professor Cornell also puts forward an alternative running royalty calculation of €12.3

21   million considering all 3G chips sold to BlackBerry.  The royalty base for this calculation

22   includes sales of communications processors regarding which, according to Marvell, MAPL

23   purportedly recognized revenue. ████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████████████

---

[6]    *See* Hansen Decl., Ex. 1 ¶ 22, ████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████

Redacted Version of Document Sought To Be Sealed

These are "[e]xemplar"

packing slips and invoices according to Marvell's counsel.[7]   (*Id.*, Ex. 19 at 2).

By engaging in these acts Marvell sold and offered to sell the patented methods and also put the claimed methods "into service," *Centillion Data Sys., LLC v. Qwest Comm. Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) (quoting *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316-17 (Fed. Cir. 2005)), a distinct form of infringement in and of itself.   Marvell's actions also fully support an inference of direct infringement by at least some end users. Professor Cornell accordingly should be permitted to testify regarding this alternative running royalty calculation.   Nothing in the Court's summary judgment decision precludes France Telecom from proving at trial that the sales in question were Marvell (as opposed to MAPL) United States sales.

**C.   In All Events, Professor Cornell Should Be Permitted To Testify Concerning The Non-Challenged Opinions Set Forth In His Report**

Solely out of an abundance of caution, France Telecom notes that Marvell seeks to preclude Professor Cornell from presenting only "certain opinions" at trial. Mot. at 1.   Marvell does not challenge, and Professor Cornell should be permitted to testify with respect to, among other things:

- The proper running royalty rate (a point on which Professor Cornell and Ms. Davis agree). (Hansen Decl., Ex. 1 ¶¶ 199-201, 205).

---

[7]   Marvell's 30(b)(6) witness testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Redacted Version of Document Sought To Be Sealed

- The role and importance of each of the 15 Georgia Pacific factors, including Professor Cornell's opinion that Georgia-Pacific Factor 1, which addresses the royalties received by licensor for licensing the patent, "plays the primary role, if not the overwhelming role, in determining a reasonable royalty between the two parties." (*Id.* ¶ 49).

- The volume suppliers of communications processors all selected a lump sum license for between █████████. Those licensees selecting a running royalty had minimal sales or were exiting the business altogether. (*Id.* ¶¶ 63-129).

- France Telecom established a going rate for lump sum licenses of between █ ██████████ irrespective of territory. (*Id.* ¶ 137).

- Any potential licensee projecting more than ████████ sold or used in the United States would have selected a lump sum license. (*Id.* ¶¶ 63, 197, Ex. 6 ("Units to Break-Even for €7,500,000 Lump Sum")).

- Marvell can sell its 3G communications processors at a higher price (and achieve greater profit) by virtue of the fact that chips may be used in the United States even if sold elsewhere. Value is added to every chip by virtue of the fact that the methods of the '747 Patent may be practiced in the United States. (*Id.* ¶ 196).

- Marvell reasonably could have expected ████████ or more of its communications processors to have been sold in the United States, including ██████████████████████████. (*Id.* ¶ 197).

- Even if Marvell did not believe that it was going to sell ██████ units to the United States, Marvell would have wanted the flexibility to sell as many units to the United States as possible and, for that reason, reasonably would have selected a lump sum license. In all events, Marvell would have needed to assure its customers that end consumers, regardless of where the handset was purchased, could use their handsets in the United States when they had occasion to visit the United States. (*Id.* ¶ 198).

OPPOSITION TO *DAUBERT* MOTION
3:12-CV-4967-WHO

- A reasonable and rational licensee would want to take the broadest possible license because it cannot control, and must assume, that its communications processors may be used in the United States. (*Id.* ¶ 136).

France Telecom also notes, again out of an abundance of caution, that there is no "requirement" or "burden" for the patentee's expert to put forward a specific quantum of damages. The Federal Circuit addressed this precise question in *Apple*. The Court explained that exclusion of the patentee's damages expert did not warrant summary judgment, noting that "[e]ven if Apple had not submitted expert evidence, this alone would not support a finding that zero is a reasonable royalty." *Apple*, --- F.3d at ---, 2014 WL 1646435, at *33. This result flows from that fact that the patent statute <u>requires</u> an award of damages "in no event less than a reasonable royalty" in the event that infringement is proven. *Id.* at *31 (quoting 35 U.S.C. § 284). "If a patentee's evidence fails to support its specific royalty estimate, the fact finder is still <u>required</u> to determine what royalty is supported by the record." *Id.* at *31 (emphasis added).

## IV.  <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should deny Marvell's *Daubert* Motion to Exclude Opinions and Testimony of Professor Cornell.

Dated: August 19, 2014

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

By:   */s/ Joseph J. LoBue*

Attorneys for Plaintiff
France Telecom, S.A.