United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCE TELECOM S.A., <br><br> Plaintiff, <br><br> v. <br><br> MARVELL SEMICONDUCTOR INC., <br><br> Defendant. | Case No. 12-cv-04967-WHO <br><br> **FINAL RULING ON PARTIES' MOTIONS *IN LIMINE* AND DEFENDANT'S *DAUBERT* MOTION** <br><br> Re: Dkt. Nos. 184, 187, 190 |

On August 26, 2014, I issued tentative views concerning the parties' motions *in limine* and Marvell's *Daubert* motion in advance of the pretrial conference. Dkt. No. 206. I heard additional argument at the pretrial conference on August 26, 2014. Based on the briefing and arguments at the pretrial conference, I issue the following final rulings.

**I.      PLAINTIFF FRANCE TELECOM'S MOTIONS IN LIMINE**

1. **Preclude Marvell from referring to claim construction proceedings, order and any other interlocutory orders**

GRANTED IN PART. Claim construction is a question of law and exclusively within the province of the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Reference to the claim construction order, including the Court's reasoning, is precluded, except for references to the actual constructions. To the extent that France Telecom now advances infringement contentions inconsistent with admissions made during the claim construction arguments, the admissions may be used by Marvell.

Marvell argues that the Court's reasoning informs the willfulness inquiry. Introduction of the Court's reasoning to support the reasonableness of Marvell's actions and its subjective belief that it did not infringe would be more prejudicial than probative and will be excluded.

Marvell states that it does not intend to refer to the Court's damages summary judgment order "unless France Telecom's positions at trial contradict the terms of that order."

2. **Preclude Marvell's damages expert from arguing or offering evidence that "running royalty" damages may be "capped" or that the lump sum royalty is €819,515**

DENIED. *Georgia-Pacific* factor #11 is "[t]he extent to which the infringer used the invention and any evidence probative of the value of that use." Accordingly, Marvell is free to argue, based on actual use of the patented method (i.e., the "book of wisdom"), that a running royalty would not exceed a certain amount. *See, e.g., Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333-34 (Fed. Cir. 2009) ("Consideration of evidence of usage after infringement started can, under appropriate circumstances, be helpful to the jury and the court in assessing whether a royalty is reasonable. . . . This quantitative information, assuming it meets admissibility requirements, ought to be given its proper weight, as determined by the circumstances of each case."). But this is only one of several relevant factors in the reasonable royalty inquiry; France Telecom will have the opportunity to attack this opinion at trial and to emphasize other factors

3. **Limit Marvell's argument or evidence that the royalty amount is €63,111 or €349,750**

DENIED. These "alternative" damages opinions consider only those Marvell sales realized after the filing of the Complaint in this case and are related to Marvell's request that its laches defense be presented to the jury for a factual finding and an advisory verdict. Laches is a question for the Court, but I have discretion to present the issue to the jury for an advisory verdict. Fed. R. Civ. P. 39(c). In this case, there appear to be overlapping issues of Marvell's willfulness and the laches defense, including when France Telecom first learned of Marvell's alleged infringement and France Telecom's alleged delay in filing suit. Presenting the issue to the jury for an advisory verdict, rather than conducting two separate trials, will conserve judicial resources. Accordingly, Marvell will be allowed to present evidence and argument regarding its laches defense to the jury. I do not believe presentation of Ms. Davis's alternative "laches damages" theories will unduly prejudice the jury. I will consider an appropriate limiting instruction to address any possible prejudice resulting from evidence on this issue.

4. **Preclude Marvell from offering any argument or evidence regarding the impact of purported non-infringing alternatives on the quantification of damages**

DENIED. France Telecom contends that Marvell's damages expert, Ms. Davis, did not adequately disclose her opinions or conclusions regarding the impact of purported non-infringing alternatives on the quantification of damages in her expert report. Ms. Davis did not disclose the specific monetary impact of purported non-infringing alternative on the damages quantification, but she opined that purported alternatives "could have been implemented at little cost and engineering time for MSI." Dkt. No. 199-4 at 40. She cites a discussion with technical expert Dr. Min in support for this contention. She may offer testimony consistent with that opinion. France Telecom can cross-examine her regarding her basis for this opinion and her lack of specificity. The alleged deficiencies in Ms. Davis's opinion are a matter of weight, not admissibility.

France Telecom also contends that Marvell's technical expert, Professor Min, is unqualified to testify regarding the relative values of various purported alternatives to the patented technology. France Telecom contends that "Prof. Min has made no efforts to *test* and *measure* the relative values of these technologies; rather, his assertions of value appear to be based solely on unsubstantiated personal opinions." France Telecom motions *in limine* at 14 (emphasis in original). But Federal Rule of Evidence does not require that Professor Min personally "test and measure" the value of the purported alternatives to the patented technology in order to offer his expert opinion. France Telecom will have the opportunity to question Professor Min regarding the bases for his opinions. As with Ms. Davis, the alleged deficiencies in Professor Min's opinion are a matter of weight, not admissibility.

5. **Preclude Marvell from arguing or offering evidence that it did not ship accused products to the United States**

DENIED IN PART; ORDERING FURTHER BRIEFING. France Telecom asserts that "Marvell appears to contend that none of the accused products sold by it were shipped to the United States because, according to Marvell, the accused products allegedly were stored in so-called "foreign trade zones" in Texas before allegedly then being shipped to Monterrey, Mexico, for assembly into RIM handsets." Dkt. No. 184 at 15. Marvell states that it intends to present evidence that the accused products are imported into the foreign trade zones by Marvell's

3

customers, not Marvell itself. Marvell also intends to present evidence that its accused chips are imported into foreign trade zones for the express purpose of exporting them for assembly into finished devices, meaning that the accused chips cannot be *used* in the United States (or, presumably, the foreign trade zone) to perform the steps of the claimed method, and therefore do not infringe. Marvell is free to introduce such evidence and the motion *in limine* is denied to the extent it seeks to preclude that evidence.

At the pretrial conference, France Telecom argued that Marvell's importation into the foreign trade zones provides the requisite "import[ation] into the United States" to hold Marvell liable for contributory infringement under 35 U.S.C. § 271(c). Marvell countered that this contributory infringement contention had not been raised previously and, in any event, Marvell is not the entity which imports the chips at issue into the foreign trade zones. If this theory of contributory infringement was properly disclosed, it is presumably a question for the jury whether Marvell is in fact the importer and whether there is the requisite direct infringement by a third party. In that case, the Court would need to determine whether the foreign trade zones are part of the United States for purposes of Section 271(c).

Because the Section 271(c) issue was not squarely presented in the motions *in limine*, additional briefing would be helpful. **Accordingly, by September 5, 2014, the parties shall file briefs, not to exceed five pages, stating (i) why this theory of liability should or should not be precluded from trial[1] and (ii) whether, for purposes of Section 271(c), the foreign trade zones are part of the United States.**

6. **Preclude Marvell from making any reference to purported co-inventors of the '747 patent**

DENIED. Marvell contends that it has admissible evidence bearing on the inventorship of the '747 patent. The evidence that Marvell references is sufficient to present to the jury. France Telecom will have the opportunity to attack this evidence at trial.

---

[1] If Marvell determines that this theory was previously disclosed and is properly presented to the jury, Marvell shall advise France Telecom promptly and the parties can focus on the second issue in their briefs.

4

## II. DEFENDANT MARVELL'S MOTIONS IN LIMINE

### 1. Preclude France Telecom from presenting testimony, argument, or evidence on certain subjects not contained in Dr. Mitzenmacher's expert reports

    a. Doctrine of equivalents

GRANTED. To support a finding of infringement under the doctrine of equivalents, the plaintiff must present "particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test." *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996). "Such evidence must be presented on a limitation-by-limitation basis. Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." *Id.*; *see also AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) ("the difficulties and complexities of the doctrine [of equivalents] require that evidence be presented to the jury or other fact-finder through the particularized testimony of a person of ordinary skill in the art, typically a qualified expert, who (on a limitation-by-limitation basis) describes the claim limitations and establishes that those skilled in the art would recognize the equivalents"); *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005). Although I was tentatively inclined to allow Dr. Mitzenmacher to testify on this topic only with respect to the two paragraphs France Telecom identified as relevant to this topic, and see if that testimony, along with other evidence, could be sufficiently linked to the claims at issue to support a finding of infringement under the doctrine of equivalents, I am convinced by the argument of Marvell at the pretrial conference and the authorities it provided that it would be error to do so.

Dr. Mitzenmacher has not provided "particularized testimony" or "linking argument" in support of an opinion of infringement under the doctrine of equivalents. France Telecom concedes that "Dr. Mitzenmacher did not purport to apply a legal standard of equivalents to the technical facts he observed." France Telecom opposition at 2-3. It nonetheless contends that "the facts and opinions he did express in his reports are more than sufficient to support a finding of infringement under the doctrine of equivalents." *Id*. It argues that Dr. Mitzenmacher can testify consistent with those facts and opinions and the jury can determine whether the doctrine of

equivalents has been satisfied. But the facts and opinions that France Telecom refers to (paragraphs 92 and 95 of Dr. Mitzenmacher's report) are not linked to the claims or limitations at issue; they are precisely the type of unparticularized testimony that the Federal Circuit has held insufficient to support a finding of infringement under the doctrine of equivalents. Moreover, the facts and opinions that France Telecom points to are not based on the Court's construction of the disputed claim terms.

For example, in paragraph 95 Dr. Mitzenmacher compares the accused method to Figure 1 of the '747 patent, but he does not refer to the claims of the patent. That is insufficient to support a finding of infringement. *See, e.g., Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1286 (Fed. Cir. 2002) ("But infringement is to be determined by comparing the asserted claim to the accused device, not by comparing the accused device to the figures of the asserted patent.") In addition, Dr. Mitzenmacher's comparison of the accused method to Figure 1 of the '747 patent is based on France Telecom's rejected construction of the claim term "systematic convolutional coding," not the construction adopted by the Court.

A key issue at claim construction was whether the term "systematic convolutional coding" requires each encoder to output both the coded data element and the uncoded data element, resulting (where there are two encoders) in an output of two coded data elements and two uncoded data elements and a 1/4 efficiency rate[2] (as Marvell argued) or whether it is sufficient that one uncoded data element is transmitted jointly with, and shared by, the two coded data elements, resulting in an output of two coded data elements and one uncoded data element and a 1/3 efficiency rate (as France Telecom argued). The Court adopted Marvell's proposed construction of systematic convolutional coding. However, in paragraph 95 of his report, Dr. Mitzenmacher opines that the accused method is "nearly identical" to Figure 1 of the '747 patent where "with each source data element X that is output two coded data elements (in this case labeled Y1 and Y2) are output, to give a code of rate 1/3." This description of Figure 1 of the '747 patent is based

---

[2] 1/4 efficiency rate because each data element results in a total output of four data elements: two coded data elements and two uncoded data elements.

on France Telecom's rejected construction; it does not address the construction adopted by the Court which requires one-to-one parity between the coded data elements output and the uncoded data elements output.

Paragraph 92 of Dr. Mitzenmacher's report is also insufficient to support a doctrine of equivalents opinion. Even assuming, as France Telecom argues, that Dr. Mitzenmacher explains, consistent with the Court's construction, that the "steps performed by the Marvell turbo coder and constituent encoders within it are both 'systematic' because they *all* output both coded and the current input data," Dr. Mitzenmacher says nothing about the "insubstantiality of the differences" between Claim 1 of the '747 patent and Marvell's accused method, or with respect to the "function, way, result test,"[3] as required to apply the doctrine of equivalents. *Texas Instruments*, 90 F.3d at 1567.

In opposition to this motion *in limine* and at the pretrial conference, France Telecom argued that the inventor of the '747 patent, Claude Berrou, can provide testimony relevant to the doctrine of equivalents, "including his understanding of the disclosures of his patent and the extent to which there is any difference between the methods prescribed by the 3GPP standard or the accused Marvell turbo encoders and the subject matter described by Claim 1 of the Berrou patent." But the testimony required to support infringement under the doctrine of equivalents—the particularized testimony on a limitation-by-limitation basis—is generally expert testimony. *See, e.g., AquaTex Indus.*, 479 F.3d at 1320. Berrou has not been qualified as an expert nor submitted an expert report. He therefore cannot testify regarding the doctrine of equivalents. *See, e.g. Verizon Servs. Corp. v. Cox Fibernet Virginia, Inc.*, 602 F.3d 1325, 1340 (Fed. Cir. 2010) (district court did not err in precluding inventors from offering expert testimony on invalidity issues where inventors had not provided a report or been qualified; limiting inventor testimony to factual testimony that did not require expert opinion); *Eugene Baratto, Textures, LLC v. Brushstrokes*

---

[3] The "function, way, result test" asks whether the accused device performs substantially the same function in substantially the same way to obtain the same result" as the patented invention. *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1376 (Fed. Cir. 2008) (citations omitted).

*Fine Art, Inc.*, 701 F. Supp. 2d 1068, 1074 (W.D. Wis. 2010) ("[inventor's] averments relating to how the invention is supposed to function and how those functions relate to any of the accused products in this case clearly constitute expert testimony").

   b. Indirect infringement

DENIED. Marvel argues that "Dr. Mitzenmacher put forth no opinion in his expert reports of any actions of Marvell that induced others to infringe (*e.g.*, providing operating instructions, user manuals, product guides, or even advertising 3GPP data functionality)." France Telecom counters that there is "adequate circumstantial and direct evidence exists to show that Marvell not only designed the accused products to practice the claimed invention, but also instructed its customers to use the accused products in an infringing way," and has induced infringement. Specifically, France Telecom refers to "product guides, advertising, source code, and test reports—as well as testimony by Marvell witnesses—showing that Marvell designed its 3GPP standards-compliant turbo encoder and decoder and aimed them for use with 3GPP-compliant networks in the United States."

Marvell argues that France Telecom should be barred from offering evidence regarding contributory infringement because "Dr. Mitzenmacher has not advanced any evidence regarding either substantial non-infringing uses or [Marvell's] knowledge of the infringement." France Telecom counters that Dr. Mitzenmacher stated that use of the accused products necessarily infringes, meaning that there are no non-infringing uses. France Telecom also states that Marvell's knowledge will be evidenced in "Marvell documents and testimony" and that "Dr. Mitzenmacher can also testify as to the tautology that the Marvell design documents and testimony he has reviewed were known to Marvell."

Indirect infringement can be proven by circumstantial evidence. *See, e.g., nCube Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317, 1324-25 (Fed. Cir. 2006) ("The record contains sufficient circumstantial evidence to support the jury's verdict of induced infringement. This evidence included SeaChange's documents, as well as the testimony of SeaChange's vice-president of engineering, which showed that the SeaChange system operated with a customer's own DNCS component. The record shows that SeaChange sold ITV systems for use with Scientific–Atlanta

8

1  equipment with the intent that customers would use them to perform the patented method, thus
2  supporting the jury's incorporation of these systems in its verdict of literal infringement.").
3  France Telecom will be afforded the opportunity to present Dr. Mitzenmacher's testimony,
4  consistent with his report, and any other admissible evidence regarding indirect infringement.

   c. Third party use

   DENIED. Dr. Mitzenmacher may offer his opinions, consistent with his report, regarding third-party use. Marvell can cross-examine him on the bases for his opinions.

   d. Coverage of 3GPP standard

   GRANTED. As was the case with respect to the doctrine of equivalents, Dr. Mitzenmacher did not address how claim 1 of the '747 patent covers the 3GPP standard under the Court's construction of "systematic convolutional coding." Paragraph 99 of the Mitzenmacher report, which France Telecom cites, states that "the original input bits are provided as output bits." But under the Court's construction, *each* encoder must output both the coded data element and the uncoded data element. Nowhere does Dr. Mitzenmacher opine that in the 3GPP standard the second encoder also outputs the uncoded element. Indeed, Figure 4 (below paragraph 99), to which Dr. Mitzenmacher refers, shows only an uncoded data element (represented as $X_k$) output with the first encoder, it does not show an uncoded data element output with the second encoder.[4] Accordingly, Dr. Mitzenmacher's opinion is based on France Telecom's rejected construction of "systematic convolutional coding." The other paragraphs cited by France Telecom, paragraphs 83 and 108, also do not apply the Court's construction of "systematic convolutional coding."

   2. **Preclude France Telecom from presenting testimony and arguing that the mere importation of Marvell 3G chips by Marvell into the United States can be an act of direct infringement without showing that those chips were in fact used to perform the claimed method steps**

   GRANTED. France Telecom argues that *Quanta Computer, Inc. v. LG Electronics, Inc.*,

---

[4] Paragraph 99 discusses that an uncoded data element, $X'_k$, is output from the interleaver and input into the second encoder, but it does not discuss that this uncoded data element is output from the second encoder. On the contrary, Figure 4 appears to show that $X'_k$ is only output from the second encoder during "trellis termination," which is not part of the regular encoding process. *See* Mitzenmacher Rept. ¶ 97.

9

553 U.S. 617 (2008) forecloses Marvell's position that a method claim can only be infringed if each of the claimed steps is performed and that sales, offers to sell, or importation do not infringe method claims. But *Quanta* involved application of the patent exhaustion doctrine; it did not hold that method claims can be infringed by offering to sell, selling, or importing a product in which a claimed method is embodied. Indeed, following *Quanta*, the Federal Circuit and district courts have repeatedly held that a person must practice all steps of the claimed method to infringe a method claim. *See, e.g., Meyer Intellectual Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1366 (Fed. Cir. 2012) ("Where, as here, the asserted patent claims are method claims, the sale of a product, without more, does not infringe the patent. Instead, direct infringement of a method claim requires a showing that every step of the claimed method has been practiced."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206 (Fed. Cir. 2010) ("To infringe a method claim, a person must have practiced all steps of the claimed method."); *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009) (same); *Isis Pharmaceuticals, Inc. v. Santaris Pharma A/S Corp.*, 2014 WL 2531973, at *4 (S.D. Cal. 2014) (noting "clear precedent that a method patent may only be infringed when each of its steps are performed within the United States"); *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 713 (E.D. Tex. 2011) ("the sale or offer for sale is insufficient to prove direct infringement of a method claim") ("reliance on Apple's sales of computers that contain the accused Mac OS X 10.4–6 software does not prove direct infringement") *aff'd,* 692 F.3d 1351 (Fed. Cir. 2012).

3. **Preclude France Telecom from presenting testimony, argument, or evidence concerning sales by nonparty Marvell Asia Pte. LTD. ("MAPL")**

GRANTED. I previously ruled that "Marvell is not liable for the actions of a third party, nor is it liable for infringement that occurred abroad." *Id*. at 23. France Telecom claims that it does not want to present testimony regarding Marvell Asia's sales, but that it is not clear whether sales belong to Marvell or MAPL. Marvell produced a spreadsheet showing sales by itself and MAPL. France Telecom contends that the "spreadsheet purports to characterize sales transactions and does so in a manner that is sharply disputed." France Telecom opp. at 10. France Telecom asked for the documents underlying the spreadsheet on August 1, 2014, per Fed. R. Evid. 1006,

10

which provides that:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Rule 1006 does not apply here because the spreadsheet was not prepared for trial; the spreadsheet is the underlying business record. *See, e.g., U-Haul Intern., Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1045-46 (9th Cir. 2009) ("the summaries *themselves* constituted the business records. They were the writings at issue, not summaries of other evidence. Thus, Rule 1006 does not apply.") (emphasis in original); *United States v. Draiman*, 784 F.2d 248, 256 n.6 (7th Cir. 1986) ("Rule 1006 contemplates the admission of a summary, prepared for trial, as *secondary* evidence of 'voluminous writings, recordings or photographs' that could not conveniently be introduced at trial. The entries on a business record, however, are considered the original entries, and therefore the business record is admissible without regard to the availability of the underlying documents.") (citations omitted).[5]

France Telecom had its opportunity in discovery to test the accuracy of the spreadsheet. Fact discovery and expert disclosures are closed. It is too late to introduce new damage theories.

4. **Preclude France Telecom from presenting testimony, argument, and evidence of conception, reduction to practice, and inventorship of the alleged inventions**

DENIED. France Telecom was arguably prohibited from requiring TDF to provide the requested documents to Marvell, and nothing prevented Marvell from started the Hague process sooner than it did. However, as noted above, Marvell will be allowed to present the evidence that it has regarding inventorship of the '747 patent.

5. **Preclude France Telecom from presenting testimony, argument, or evidence using the term "turbo codes" as a proxy for the claimed invention**

DENIED. At trial, Marvell will have the chance to present evidence that turbo codes are

---

[5] In addition, it appears, based on Marvell's presentation at the pretrial conference, that all of the individual entries which France Telecom contended were improperly characterized were in fact characterized as sales by Marvell, not MAPL, and are therefore presumably captured by France Telecom's damage theories. France Telecom's argument that the spreadsheet is inaccurate is, at best, speculative.

11

not covered by the '747 patent, but France Telecom should not be barred from presenting evidence of the opposite or referring to the claimed invention as "turbo codes."

6. **Preclude France Telecom from raising or referring to how Marvell manages its tax burden**

GRANTED. Marvell's treatment of its tax burden is irrelevant. However, should Marvell somehow make it relevant, France Telecom will be free to address the issue.

## III. MARVELL'S *DAUBERT* MOTION

Marvell has filed a *Daubert* motion to preclude France Telecom's damages expert, Professor Cornell, from testifying regarding (i) his opinions on alternative damages scenarios that are based on worldwide sales and sales of non-party MAPL, including his opinion on the lump sum royalty, and his opinions on the two alternative running royalties that use "Marvell 3G Chips" and "Marvell 3G Chips Sold to RIM" as the base; (ii) his opinions regarding the alleged level of importation, use, and roaming use in the United States; and (iii) his opinions of the use of sales data by BlackBerry as a proxy for alleged infringing use in the United States.

1. **Lump sum royalty opinion**

Professor Cornell opines that Marvell would have negotiated for a lump-sum royalty rather than a running royalty because, at that time, Marvell projected sales of such a volume that the lump sum would have been more economical than a running royalty. Marvell argues that Professor Cornwell's opinion is "legally erroneous" because he did not distinguish between Marvell and non-parties Marvell Technology Group Ltd. ("MTGL") and Marvell Asia Pte. Ltd ("MAPL") in his hypothetical negotiation, i.e., his hypothetical negotiation was between France Telecom on one side and, on the other side, an "integrated entity" of Marvell, MTGL, and MAPL, even though MGTL and MAPL are not parties to this suit.[6] I previously ruled that "Marvell is not liable for the actions of a third party, nor is it liable for infringement that occurred abroad." *Id*. at 23.

Marvell's motion to exclude Professor Cornell's testimony regarding the lump-sum royalty

---

[6] Marvell and MAPL are both subsidiaries of MTGL. Dkt. No. 160 at 2.

is DENIED. While his opinion is based on forecasts which did not differentiate between the various Marvell entities, he explains why he believes that the portion of the forecasted sales which would have been sold in the United States—sales which he opines would have been recognized by defendant Marvell—exceed the number of sales which would make a lump-sum royalty more economical than a running royalty, i.e., the "break-even" point.[7] Marvell can attack the reasonableness of those opinions at trial.

Professor Cornell's opinion is based on forecasts which did not differentiate between the various Marvell entities. He states that "[n]o documents have been produced indicating Marvell's forecasted sales to the United States."[8] Hansen Decl., Ex 1, Cornwell Rept. ¶ 192. But Professor Cornell explains how he extrapolated forecasts attributable to Marvell from the undifferentiated forecasts. According to Professor Cornell, the forecasted sales for the combined Marvell entities are more than double the "break-even" point. Professor Cornell opines that the portion of those forecasted sales attributable to sales in the United States, and recognized by Marvell, still exceeds the "break-even" point because the Marvell entities expected that more than three quarters of their sales would go to their largest customer, and a significant portion of that customer's revenues (65% in 2006) was from the United States.

Marvell contends that "Professor Cornell admitted that the *only* way to meet the . . . "break-even" point to justify his lump sum royalty . . . was to include both MSI and MAPL sales." Mot. at 7 (emphasis in original). That is not accurate. With the benefit of hindsight, Professor Cornell testified that Marvell's actual sales were not enough to meet the "break-even" point, but that has no bearing on Marvell's forecasts at the time of the hypothetical negotiation.

Professor Cornell lump sum opinion is sufficiently reliable to present to the jury. Any perceived deficiencies in the opinion go to its weight, not its admissibility. Marvell can draw out those purported deficiencies on cross-examination.

---

[7] The various figures at issue, e.g., the number of units needed to make the lump-sum royalty preferable to the running royalty and the specific royalty figures identified by Professor Cornell, are confidential and I therefore do not identify the specific figures.

[8] Marvell does not dispute that no forecasts specific to it were produced.

2. **Running royalty opinions**

Professor Cornell also provided four running royalty scenarios in the event that the jury finds that France Telecom and Marvell would have negotiated a running royalty rather than a lump sum royalty. The four alternative scenarios are based on (i) Marvell 3G chips; (ii) Marvell 3G chips sold to RIM [Blackberry]; (iii) Marvell 3G chips shipped to the United States; and (iv) Marvell 3G chips sold to RIM, which RIM than sold into the United States as part of assembled handsets.

Marvell contends that the scenarios based on "Marvell 3G chips" and "Marvell 3G chips sold to RIM" are unreliable and should be excluded because they include worldwide sales and sales of non-party MAPL and are barred by my summary judgment ruling. *See* Dkt. No. 160. France Telecom does not address the scenario based on Marvell 3G chips in its opposition brief, apparently conceding that that scenario is barred by my summary judgment ruling. It is, because it is based on alleged sales of the accused invention by non-parties. With respect to the scenario based on "Marvell 3G chips sold to RIM", France Telecom responds that "[n]othing in the Court's summary judgment decision precludes France Telecom from proving at trial that the sales in question were Marvell (as opposed to MAPL) United States sales." Opp. at 21. There does not seem to be any basis for that contention, and I would exclude it as well.

Marvell contends that the scenario based on "Marvell 3G chips sold to RIM, which RIM then sold into the United States as part of assembled handsets" should be precluded because it includes RIM handsets with chips supplied by non-party MAPL, rather than Marvell. I disagree. The document from RIM, upon which Professor Cornell based this scenario, does not differentiate between sales from Marvell and sales from MAPL. But given that the list is limited to handsets which RIM sold into the United States, it is a reasonable proxy for Marvell sales in the United States. Marvell can develop any deficiencies in this scenario at trial.

I also reject Marvell's argument that Professor Cornell impermissibly used the document from RIM, which lists *sales* to the United States, as a proxy for *use* in the United States. The parties agree that Marvell has no means of tracking where its chips are actually used. But France Telecom may rely on circumstantial evidence, including sales figures, to establish use of the

14

patented methods. *See, e.g., Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009) ("the jury reviewed evidence relating to the extensive sales of Microsoft products and the dissemination of instruction manuals for the Microsoft products. The jury also heard corresponding testimony from Lucent's infringement expert. The circumstantial documentary evidence, supplementing the experts' testimony, was just barely sufficient to permit the jury to find direct infringement by a preponderance of the evidence."); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) (affirming finding of infringing use based on "circumstantial evidence of extensive puzzle sales, dissemination of an instruction sheet teaching the method of restoring the preselected pattern with each puzzle, and the availability of a solution booklet on how to solve the puzzle"). Whether France Telecom has enough circumstantial evidence of use to prove infringement remains to be seen, but Professor Cornell's reliance on Blackberry's sales figures are not so unreliable that his opinion cannot be presented to the jury.

**IT IS SO ORDERED.**

Dated: August 28, 2014

WILLIAM H. ORRICK
United States District Judge