UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCE TELECOM S.A.,<br><br>   Plaintiff,<br><br>  v.<br><br>MARVELL SEMICONDUCTOR INC.,<br><br>   Defendant. | Case No. 12-cv-04967-WHO<br><br>**FINAL ORDER REGARDING JURY INSTRUCTIONS** |

  The Court adopts the following disputed final instructions. In general, where the parties disagreed on the instructions, I adopted instructions that mirror the Model Patent Jury Instructions for the Northern District of California or other model instructions, such as the Federal Circuit Bar Association Model Patent Jury Instructions. In addition, I generally rejected instructions that appeared to comment unnecessarily on specific evidence or allegations at issue in this case.

  The parties may refer to the laches instruction below in closing, but may not refer to the specifics of Ms. Davis's testimony or any other evidence that was pertinent only to laches. If France Telecom intends, as Mr. Dabney indicated, to list a series of defenses that it contends are baseless, it may include laches in the list but may not refer to specific evidence in support of that argument. Argument in closing about an issue that will not be presented to the jury would needlessly confuse the jury.

  I will file a complete set of the instructions later this evening.

# CONTENTS[1]

Final Jury Instruction No. 23 Method Claims ................................................................................. 3

Final Jury Instruction No. 26 Direct Infringement .......................................................................... 4

Final Jury Instruction No. 27 Infringement—Extraterritoriality ...................................................... 5

Final Jury Instruction No. 32 Inducing Patent Infringement ............................................................ 6

Final Jury Instruction No. 33 Contributory Infringement ................................................................ 7

Final Jury Instruction No. 34 Willfulness ........................................................................................ 8

Final Jury Instruction No. 38 Invalidity—Improper Inventorship ................................................... 9

Final Jury Instruction No. 42 Damages—Reasonable Royalty—Definition ................................. 10

Final Jury Instruction No. 43 Damages—Availability of Non-Infringing Alternatives ................ 13

Final Jury Instruction No. 44 Damages—Extraterritoriality .......................................................... 14

Final Jury Instruction No. 45 Damages—Instances Of Direct Infringement ................................. 15

Final Jury Instruction No. 47 Damages—Laches Defense ............................................................ 16

---

[1] If necessary, the instructions will be renumbered to correct for any gaps resulting from instructions not given or given in a different order than what was requested.

**FINAL JURY INSTRUCTION NO. 23**

**METHOD CLAIMS**

The asserted claim in this case describes a method, and is therefore referred to as a "method" claim. Method claims recite a series of steps that comprise the patented invention. The word "comprises" in this context means "includes at least." That is, if a method includes all of the steps that are described by a patent claim, the method is described by the claim even though it may also include additional steps. The claim asserted in this case—claim 1—is a method claim.

**FINAL JURY INSTRUCTION NO. 26**

**DIRECT INFRINGEMENT**

A patent's claims define what is covered by the patent. A method directly infringes a patent if it is covered by at least one claim of the patent.

Deciding whether a claim has been directly infringed is a two-step process. The first step is to decide the meaning of the patent claim. I have already made this decision, and I have already instructed you as to the meaning of the asserted patent claim. The second step is to decide whether an accused direct infringer has used a method covered by the asserted claim of the '747 patent within the United States. If it has done so, it infringes. You, the jury, make this decision.

You have heard evidence about Marvell Semiconductor's commercial products and methods. Your decision must be based on a comparison of the accused methods to the asserted claim, not a comparison of Marvell Semiconductor's products to the figures of the '747 patent.

Whether or not an accused direct infringer knew the method infringed or even knew of France Telecom's patents does not matter in determining direct infringement.

**FINAL JURY INSTRUCTION NO. 27**

**INFRINGEMENT—EXTRATERRITORIALITY**

A U.S. Patent does not have extraterritorial effect.  In other words, it cannot be enforced against conduct that takes place outside of the United States, and an accused infringer cannot be liable for the wholly foreign manufacture and sale of products that would otherwise infringe a U.S. Patent had those activities happened in the United States.  France Telecom must prove that Marvell Semiconductor engaged in conduct within the United States that infringed the '747 patent or actively induced or contributed to infringement of the '747 patent.  Because claim 1 is a method claim, each step of claim 1 must be practiced entirely within the United States in order for you to find infringement.

# FINAL JURY INSTRUCTION NO. 32

## INDUCING PATENT INFRINGEMENT

France Telecom argues that Marvell Semiconductor has actively induced another to infringe the '747 patent. In order for Marvell Semiconductor to induce infringement, Marvell Semiconductor must have induced another to directly infringe claim 1 of the '747 patent; if there is no direct infringement by a third party, there can be no induced infringement. This means that some third party must practice each and every step of the accused method within the United States.

In order to be liable for inducement of infringement, Marvell Semiconductor must:

(1)  have intentionally taken action that actually induced direct infringement by a third party;

(2)  have been aware of the '747 patent;

(3)  have known that the acts it was causing would infringe the patent; and

(4)  not have had a good faith belief the patent was invalid or not infringed.

If the four requirements just stated are not met, Marvell Semiconductor cannot be liable for inducement unless it actually believed that it was highly probable its actions would encourage infringement of the '747 patent, it believed the '747 patent to be valid, and it deliberately chose to avoid learning the truth. To prove inducement, it is not enough that Marvell Semiconductor was merely indifferent to the possibility that its actions might encourage infringement of a valid patent. Nor is it enough that Marvell Semiconductor took a risk that was substantial and unjustified.

In deciding whether the Marvell Semiconductor induced infringement, you may consider whether Marvell Semiconductor actually believed that the acts it encouraged did not infringe the patent, and whether Marvell Semiconductor had a good-faith belief that the patent would be held invalid.

# FINAL JURY INSTRUCTION NO. 33

## CONTRIBUTORY INFRINGEMENT

France Telecom argues that Marvell Semiconductor has contributed to infringement by another. Contributory infringement may arise when someone supplies something that is used to infringe one or more of the patent claims.

As with inducement, in order for there to be contributory infringement by Marvell Semiconductor, someone other than Marvell Semiconductor must directly infringe a claim of the '747 patent; if there is no direct infringement by anyone, there can be no contributory infringement.

If you find someone has directly infringed the '747 patent, then contributory infringement exists if:

(1) Marvell Semiconductor supplied an important component of the infringing part of the accused method;

(2) the component is not a common component suitable for non-infringing use; and

(3) Marvell Semiconductor supplied the component with knowledge of the '747 patent and knowledge that the component was especially made or adapted for use in an infringing manner.

A "common component suitable for non-infringing use" is a component that has uses other than in the patented method, and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical.

**FINAL JURY INSTRUCTION NO. 34**

**WILLFULNESS**

In this case, France Telecom argues that Marvell Semiconductor willfully infringed the '747 patent.

If you have decided that Marvell Semiconductor has infringed, you must go address the additional issue of whether or not this infringement was willful. Willfulness requires you to determine that it is highly probable that Marvell Semiconductor acted recklessly.

To prove that Marvell Semiconductor acted recklessly, France Telecom must prove two things are highly probable:

The first part of the test is objective: France Telecom must persuade you that Marvell Semiconductor acted despite a high likelihood that its actions infringed a valid and enforceable patent. In making this determination, you may not consider Marvell Semiconductor's state of mind. Legitimate or credible defenses to infringement, even if not ultimately successful, demonstrate that Marvell Semiconductor was not reckless.

Only if you conclude that the Marvell Semiconductor's conduct was reckless do you need to consider the second part of the test. The second part of the test does depend on the state of mind of Marvell Semiconductor. France Telecom must persuade you that Marvell Semiconductor actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent. To determine whether Marvell Semiconductor had this state of mind, consider all facts which may include, but are not limited, to:

(1) Whether or not Marvell Semiconductor acted in accordance with the standards of commerce for its industry;

(2) Whether or not Marvell Semiconductor intentionally copied a product of France Telecom that is covered by the '747 patent;

(3) Whether or not Marvell Semiconductor made a good-faith effort to avoid infringing the '747 patent, for example, whether Marvell Semiconductor attempted to design around the '747 patent; and

(4) Whether or not Marvell Semiconductor tried to cover up its infringement.

**FINAL JURY INSTRUCTION NO. 38**

**INVALIDITY—IMPROPER INVENTORSHIP**

Marvell Semiconductor can meet its burden of proving that the '747 patent is invalid by showing that the patent fails to name all actual inventors. This is known as the "inventorship" requirement.

Anyone who makes a significant contribution to the conception of one or more claims of the patent is an inventor. Persons may be inventors even though they do not physically work together or make the same type or amount of contribution, or contribute to the subject matter of each claim of the patent. However, merely helping with experimentation by carrying out the actual inventor's instructions or explaining the actual inventor's well-known concepts or the current state of the art does not make someone an inventor.

# FINAL JURY INSTRUCTION NO. 42

## DAMAGES—REASONABLE ROYALTY—DEFINITION

A royalty is a payment made to a patent holder in exchange for the right to make, use or sell the claimed invention.  This right is called a "license."  A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the infringer taking place at the time when the infringing activity first began.  In considering the nature of this negotiation, you must assume that the patent holder and the infringer would have acted reasonably and would have entered into a license agreement.  You must also assume that both parties believed the patent was valid and infringed.  Your role is to determine what the result of that negotiation would have been.  The test for damages is what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

A royalty can be calculated in several different ways and it is for you to determine which way is the most appropriate based on the evidence you have heard.  One way to calculate a royalty is to determine a one-time lump sum payment that the infringer would have paid at the time of the hypothetical negotiation for a license covering all sales of the licensed product in the United States, both past and future.  When a one-time lump sum is paid, the infringer pays a single price for a license covering both past and future infringing sales.  At the time of the hypothetical negotiation, the parties would only know the past sales; they would not have known what future sales would be.

Another way to calculate a royalty is to determine what is called an "ongoing" or "running royalty."  To calculate an ongoing or running royalty, you must first determine the "base," that is, the product on which the infringer is to pay.  You then determine what amount per unit in dollars (or fractions of dollars) the parties would have agreed to in the hypothetical negotiation. Multiplying this amount by the number of products sold will provide the total damages.

An ongoing or running royalty differs from payment of an lump sum because, with an ongoing or running royalty, the licensee pays based on the number of actual licensed products it sells.  For example, if the patent covers a nail, and the nail sells for $1.00, you might find that the parties would have agree to a per unit royalty of 1 cent in a hypothetical negotiation.  If the licensee sold 200 nails, the damages owed would be $2.00 (200 times 1 cent).

In determining a reasonable royalty, you may consider the following factors:

(1)    The royalties received by France Telecom for the licensing of the '747 patent, proving or tending to prove that an established royalty exists.

(2)    The rates paid by Marvell Semiconductor for the use of other patents comparable to the '747 patent.

(3)    The nature and scope of the license, as exclusive or nonexclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold.

10

(4) France Telecom's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

(5) The commercial relationship between France Telecom and Marvell Semiconductor, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

(6) The effect, if any, of selling the patented specialty in promoting sales of other products of Marvell Semiconductor, the existing value of the invention to France Telecom as a generator of sales of its nonpatented items, and the extent of such derivative or convoyed sales.

(7) The duration of the '747 patent and the term of the license.

(8) The established profitability of products, if any made under the patent, their commercial success, and the current popularity.

(9) The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

(10) The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the France Telecom, and the benefits to those who have used the invention.

(11) The extent to which Marvell Semiconductor has made use of the invention and any evidence probative of the value of that use.

(12)  The portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions.

(13) The portion of the realizable profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by Marvell Semiconductor.

(14) The opinion and testimony of qualified experts.

(15) The amount that a licensor (such as France Telecom) and a licensee (such as Marvell Semiconductor) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty the infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people. The final factor establishes the framework which you should use in determining a reasonable royalty, that is, the payment that would have resulted from a negotiation between the patent holder and the infringer taking place at a time prior to when the infringement began.

It is up to you, based on the evidence, to decide what type of royalty is appropriate in this case.

# FINAL JURY INSTRUCTION NO. 43

## DAMAGES—AVAILABILITY OF NON-INFRINGING ALTERNATIVES

One of the factors that would have been considered during the reasonable royalty hypothetical negotiation is the availability of acceptable non-infringing alternatives to the patented technology. Not all alternatives are acceptable non-infringing alternatives. To be an acceptable non-infringing alternative, the alternative must have been acceptable to both the party and its customers. Also, the alternative must have been available to the party, meaning the party must have had the capability of implementing the alternative. However, an acceptable non-infringing alternative need not have actually been produced, marketed, or sold during the period of infringement, so long as it was available to the party. To determine whether there were acceptable non-infringing alternatives, you may consider the following:

(1) Whether the alternative was available around the time of the hypothetical negotiation;

(2) Whether the effects of using the alternative were known in the industry;

(3) Whether the alternative would have had the advantages of the patented invention;

(4) Whether customers would have accepted the alternative;

(5) Whether the party had the necessary equipment, know-how, and experience to implement the alternative; and

(6) The time and cost to the party of implementing the alternative.

**FINAL JURY INSTRUCTION NO. 44**

**DAMAGES—EXTRATERRITORIALITY**

U.S. patent law does not operate outside the United States.  Patent infringement damages compensate only for the consequences of domestic activity.  Thus, you may not award damages based on the wholly foreign manufacture, sale, offer for sale or use of an accused product that would otherwise infringe if such activity occurred within the United States.

**FINAL JURY INSTRUCTION NO. 45**

**DAMAGES—INSTANCES OF DIRECT INFRINGEMENT**

If you find infringement, you may award damages only where France Telecom has proved that Marvell Semiconductor or a third party has used the accused method within the territory of the United States. France Telecom must prove the extent of such infringing use with reasonable certainty because the amount of awardable damages must be correlated with the extent the accused method has been used in the United States. In other words, you should award only those damages that France Telecom establishes that it more likely than not suffered.

## FINAL JURY INSTRUCTION NO. 47

## DAMAGES—LACHES DEFENSE

You heard in the Opening Statement about the parties' contentions concerning laches, and you have heard evidence about laches as well. France Telecom argues that the laches defense does not have any merit; Marvell Semiconductor disagrees. The decision whether laches occurred in this case is actually for the Court and not the jury, but you heard about it because I told the parties before the trial started that I would submit the question to the jury for an advisory opinion. I have changed my mind about that, and I will make the decision without the benefit of your opinion. For purposes of your deliberations, you should disregard the testimony of Ms. Davis with respected to "laches" damages during a two-month period in 2012.

**IT IS SO ORDERED**.

Dated: September 29, 2014

WILLIAM H. ORRICK
United States District Judge